John F. RAY, Sr.; Ronald L. Bishop; Thomas D. Brown; Leonard Deal; Violet Firks; Edward W. Kinerk; Allen Monroe and Catherine O. Murchland, Plaintiffs,

v.

INDIANA & MICHIGAN ELECTRIC COMPANY, Defendant.

Civ. No. F 78–148.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

May 11, 1984.

Douglas B. McFadden & Jennifer L. Graham, Dutton, Kappes & Overman, Paul Hirsch & Robert V. Bridewell, Haymaker, Hirsch & Fink, Indianapolis, Ind., Ivan A. Lebamoff, Lebamoff & Associates, Fort Wayne, Ind., for plaintiffs.

C. Eric Chickedantz & Thomas Yoder, Livington, Dildine, Haynie & Yoder, Fort Wayne, Ind., for defendant.

## ON MOTION FOR SUMMARY JUDGMENT

WILLIAM C. LEE, District Judge.

This matter is before the court on plaintiffs' Motion for Summary Judgment. The motion was filed only twelve days before the case was set down for trial. The motion was based on the potential offensive collateral estoppel effect of *City of Mishawaka v. American Electric Power Co., Inc.*, 465 F.Supp. 1320 (N.D.Ind.1979), *aff'd in part, vacated in part,* 616 F.2d 976 (7th Cir.1980). The district court decided *Mishawaka* January 30, 1979; the Seventh Circuit decided the appeal February 21, 1980 and denied rehearing and rehearing en banc March 31, 1980. Certiorari was denied by the United States Supreme Court on January 12, 1981. 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

. Under Rule 7(b) of the Local Rules for this District, defendant was entitled to fifteen days to formulate a response to this motion and after such a response plaintiffs were entitled to five days to file a reply. Thus, it is clear that this motion could not have been fully briefed, much less decided, before trial was to commence. After discussing this matter with the parties at a pre-trial conference held on March 4, 1982, the court decided, with their consent, to take this matter under advisement, hold the trial as scheduled, and rule on it post trial, after defendant had had a chance to submit a response. Defendant having submitted its response and the time within which plaintiffs are entitled to reply having expired, this matter is now ripe for ruling.

In this motion plaintiffs seek summary judgment on several issues in this litigation, primarily on the basis of the collateral estoppel effect of the findings and judgment in *City of Mishawaka v. American Electric Power Company, Inc.*, 465 F.Supp. 1320 (N.D.Ind.1979) (hereinafter *"Mishawaka"*). On some of the issues, however, summary judgment does not depend solely on the application of collateral estoppel, but rather requires an evaluation of the facts in this case. Since the court has now received all the evidence in this case, it would make little sense to undertake these evaluations on the basis of the limited evidence available at the summary judgment stage. Thus, the issues which do not turn on the collateral estoppel effect of

*Mishawaka* will not be considered in this order, but will be left for the court's findings of fact.

The issues of the relevant geographic market and defendant's monopoly over the sale of wholesale power and electricity to the Fort Wayne municipal utility (City Light) fall in this category. In support of their motion for summary judgment on the relevant geographic market issue, plaintiffs quote *Mishawaka* to establish the standard for making this determination and then submit excerpts from a deposition to show that on the facts here the relevant geographic market should be the Fort Wayne rate area. Plaintiffs' argument on the supply monopoly issue follows the same form. Plaintiffs quote *Mishawaka* to show that defendant had a monopoly on the supply of wholesale electric power to the municipal utilities involved in that action and submit the contract between City Light and defendant to show that a similar arrangement exists here.[1]

These issues are clearly not collateral estoppel issues, but rather require application of a legal standard stated in *Mishawaka* to the facts in this action. Thus, the court will deny summary judgment on these issues, and instead rule on them in the course of making findings of fact and conclusions of law based on all of the evidence in the case.

In *Mishawaka* ten municipal corporations in northern Indiana and southern Michigan, not including Fort Wayne, brought an action against the American Electric Power Company, Inc. ("AEP"), the American Electric Power Service Corporation ("AEPSC"), and the Indiana & Michigan Electric Company ("I & M"). Plaintiffs alleged that defendants violated § 2 of the Sherman Act by using I & M's monopoly over the supply of wholesale electricity to plaintiffs to expand I & M's service area. Plaintiffs' cause of action was based on their charge that the defendants engaged in anti-competitive acts which had the purpose and effect of monopolizing the retail electricity market in northern Indiana and southwestern Michigan. First, plaintiffs claimed that since January 13, 1973, plaintiffs were subjected to a "price squeeze" whereby defendants required plaintiffs to pay more for their wholesale electric power than they would have had to pay if they purchased the same electric power at retail. In addition, plaintiffs claimed that the defendants had threatened to refuse to deal with them and thereby leave them without a source of supply for their utilities. After plaintiffs put in their evidence on these claims, defendants moved for dismissal of plaintiffs' complaint, and, after this motion was denied, they rested without presenting any evidence.

The court found that I & M's price structure since 1972 had subjected plaintiffs to an illegal price squeeze. On the basis of this price squeeze, defendants' threats of cutting off plaintiffs' supply of electricity, and defendants' long standing policy of acquiring municipal utilities, the court found that defendants had specific intent to monopolize and were therefore subject to antitrust liability. The court based its finding on the combination of defendants' anti-competitive behavior. As the Court of Appeals noted, each aspect of defendants' activity standing alone might not have been illegal, rather, "It is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor." *Mishawaka*, 616 F.2d at 968.

In fashioning plaintiffs' relief the court noted that plaintiffs were subject to two types of monopolistic overcharge as a result of defendants' price squeeze. During the period 1972 to 1976 plaintiffs were subject to a wholesale rate found to be unjust and unreasonable by an Administrative Law Judge in Federal Power Commission

---

1. Plaintiffs also submitted in support of their motion on this issue an excerpt from *Mishawaka* regarding I & M's activities in Fort Wayne. Since the issue of whether the finding from which this excerpt was taken should be given collateral estoppel effect was directly put in issue elsewhere in plaintiffs' motion, it will be considered when the court considers that issue. Even if the court were to find that this finding should apply here, the court would still have to evaluate the evidence in this case before it could decide that issue.

Docket No. E–7740. Based on this decision the parties entered into a settlement providing for a refund. Although the court found that this refund was not an antitrust damage remedy, the court awarded no damages for the overcharges in this period. During the period August 1976 to August 1978, after the E–7740 had been found unreasonable, the court found that plaintiffs were overcharged by more than $4,000,000 and awarded plaintiffs judgment against defendants in treble that amount. The court also granted plaintiffs' request for a permanent injunction restraining defendants from engaging in similar anticompetitive practices in the future.

On appeal, the court's finding of liability was upheld but both the injunction and damage remedies were vacated. The Court of Appeals, in instructing the district court on remand, noted that although the district court had only awarded damages for the period August 1976 through August 1978, it could consider on remand damages suffered by plaintiffs during the entire period covered by the complaint. Because the cause was ultimately dismissed on a stipulation submitted by the parties pursuant to a settlement agreement, no final judgment of damages was ever entered.[2]

In the cause presently before the court, I & M is charged with violating 15 U.S.C. § 2 with respect to its leasing of the electric facilities of Fort Wayne Municipal Light Company (City Light). The plaintiffs in this cause are a class which consists of approximately 27,000 current residential purchasers of electricity in the Fort Wayne rate area who were formerly customers of City Light, who became customers of I & M on March 1, 1975 when the subject lease went into effect, and who resided within the former Fort Wayne rate area on the date of class certification.

Plaintiffs' complaint originally alleged two theories of liability. Plaintiffs' first claim that defendant abused its monopoly of retail electric service obtained by the lease of City Light's facilities was dismissed by this court's May 31, 1979 order. Thus, the only remaining theory of liability is that I & M violated the antitrust laws in its acquisition of a monopoly in the Fort Wayne retail electricity market.

Plaintiffs contend that I & M achieved this monopoly by means of various anticompetitive acts and practices, including: (1) its long-standing policy of acquiring municipal electric facilities; (2) successful opposition to Fort Wayne's plan to expand the generation facilities of City Light in 1963; (3) the charging of unjust and unreasonable wholesale rates from 1972 to 1975; and (4) threatening that it would not build its new corporate headquarters in Fort Wayne if it did not acquire the assets of City Light by sale or lease.

Before the lease went into effect, plaintiffs allege that City Light and I & M competed in the sale of electric power to retail customers in the Fort Wayne rate area. During this time, the residential customers of I & M and City Light were subject to approximately the same electric rates. The rates in effect for defendant's residential customers outside the Fort Wayne rate area were higher than those in effect for retail electricity consumers inside the Fort Wayne rate area. This advantageous rate differential continued until February 1977 when the Fort Wayne rate area was abolished and the electric rates charged to the plaintiff class were raised to the level of those charged by I & M to residential customers outside the Fort Wayne rate area. In this action plaintiffs seek to recover for the loss of this advantageous rate differential.

---

**2.** In reviewing the *Mishawaka* decision the court takes judicial notice of its own files and records. Rule 201, FED.R.EVID.; *cf., Oburn v. Shapp,* 393 F.Supp. 561 (E.D.Pa.), *aff'd.,* 521 F.2d 142 (3d Cir.1975) (the court took judicial notice of a consent decree in a companion case); *Webb v. Nolan,* 361 F.Supp. 418 (M.D.N.

C.1972) (on a motion to dismiss the court took judicial notice of prior litigation by plaintiff in the same court); *United States v. Bowman,* 609 F.2d 12 (D.C.Cir.1979) (application of collateral estoppel in a criminal case requires an examination of the pleadings, evidence, and jury instructions in the prior proceeding).

In order to invoke the doctrine of collateral estoppel to bar a party from litigating an issue determined in a prior action, plaintiffs must show that:

(1) In the prior action there was a final determination of the merits of the issues sought to be collaterally estopped;

(2) The issues sought to be precluded must have been necessary, material, and essential to the prior outcome;

(3) The issues sought to be precluded must have been actually litigated in the prior action, with the party against whom the estoppel is asserted having had a full and fair opportunity to litigate the issues; and

(4) The issues actually and necessarily decided in the prior litigation must be identical to the issues sought to be estopped.

*GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1211 (S.D.N.Y.1981).[3] *See Continental Can Co. v. Marshall*, 603 F.2d 590 (7th Cir.1979); 1B *Moore's Federal Practice* ¶ 0.441[2] (2d Ed.1978).

■ Because plaintiffs seek to invoke collateral estoppel offensively,[4] they must clear additional hurdles before the court will allow the doctrine's application. In *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court for the first time made collateral estoppel available as an offensive weapon. The Court states that despite several problems that might accompany its use, "[t]he preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied." *Parklane*, 439 U.S. at 331, 99 S.Ct. at 651. In exercising this discretion the trial courts are to consider

(1) whether the plaintiff would have easily joined in the prior action; (2) whether defendant had incentive to defend vigorously in the prior action; (3) whether the judgment relied upon as the basis for collateral estoppel is inconsistent with previous judgments in favor of defendant; and (4) whether the second action affords the defendant procedural opportunities unavailable in the first action that could cause a different result. If after consideration of these factors, or for other reasons, it appears that the application of offensive collateral estoppel would be unfair to the defendant, the trial court should not allow its use. Because the court need not consider whether plaintiffs have fulfilled the requirements of collateral estoppel if it finds that its use would be unfair, the court will consider the fairness issue first.

I. *Fairness of Offensive Collateral Estoppel.*

■ Plaintiffs offer two explanations to justify their failure to attempt to join as plaintiffs in *Mishawaka*. Plaintiffs claim that the joinder of the instant class in *Mishawaka* would have turned that action into a "Frankenstein monster," and that they could not join *Mishawaka* because the issue of plaintiffs' standing to bring suit was first decided only after judgment was rendered in that case. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The court cannot accept plaintiffs' argument that the ambiguities surrounding the issue of their standing as consumers to bring an antitrust suit prevented them from joining in *Mishawaka*. Before *Reiter*, the law was only ambiguous; it did not rule out suits by consumers. Some courts had ruled in favor of consumers' standing to sue, *see Bravman v. Bassett Furniture Industries*, 552 F.2d

---

3. In *GAF* the court also lists the requirement that the party against whom estoppel is sought must have been a party, or in privity with a party to the prior action. Because I & M was clearly a party to *Mishawaka* this prerequisite is not in doubt and will not be discussed in the text.

4. When collateral estoppel is used "offensively" it is invoked by plaintiff to preclude a defendant from litigating an issue which the defendant has previously litigated and lost in a prior action with a different party. Collateral estoppel is more commonly used defensively, to prevent a plaintiff from relitigating an issue which the plaintiff has previously litigated and lost against another defendant.

90, 95–101 & n. 23 (3d Cir.1977); *Cleary v. Chalk*, 488 F.2d 1315, 1319 n. 17 (D.C.Cir. 1973), and others had ruled against it. *E.g., Reiter v. Sonotone Corp.*, 579 F.2d 1077 (8th Cir.1978). As defendant points out, this argument is inconsistent with the fact that plaintiffs initiated this action before *Reiter* was decided, in the midst of the ambiguity that allegedly prevented their joinder in *Mishawaka*. One would think that if the ambiguity over their standing dissuaded them from joining in *Mishawaka*, it would have also dissuaded them from filing this action.

Plaintiffs' argument that *Mishawaka* would not have been manageable if the plaintiff class had joined in it is also suspect. First, the determination of manageability should be made by the court which is charged with managing the action, rather than by the non-joining party. *GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203 (S.D.N.Y.1981), a case upon which plaintiffs rely to show that offensive collateral estoppel is proper in antitrust actions, provides an interesting comparison. In that case, GAF sought to collaterally estop defendant from relitigating or denying certain issues decided in *Berkey Photo, Inc. v. Eastman Kodak*, 457 F.Supp. 404 (S.D.N.Y.1978), *aff'd. in part and rev'd. in part*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). *Berkey* was filed three months before *GAF* and both cases were assigned to the same judge as related cases. Defendant Kodak sought a consolidation, but the court found that the cases were different in substantial respects and promised to be extremely complex jury trials. He therefore ordered separate trials. Based on this finding, the court in *GAF* found that GAF could not have easily joined in *Berkey*. Here the court has no such finding, as the *Mishawaka* court was never asked to make one. It is certainly not a foregone conclusion that Judge Sharp would have disallowed joinder. That case went to trial based on a consolidated complaint in which the claims of a case filed on December 13, 1977 were joined. Even though plaintiffs may not have been able to file an action

before they suffered their alleged injury in the loss of the differential which occurred in February of 1977, they had ample time to join in the *Mishawaka* case. The consolidated complaint in *Mishawaka* was filed a year and four months later on June 1, 1978. Furthermore, the fact that this complaint was filed the day after defendants rested in *Mishawaka* does not reassure the court that plaintiffs had not adopted the "wait and see" attitude that the *Parklane* court sought to discourage by adopting the rule against offensive collateral estoppel where plaintiffs could have easily joined in the prior action.

Offensive collateral estoppel would also be unfair in this case because defendant had little incentive to defend vigorously on several of the issues on which plaintiffs now seek collateral estoppel. Because the City of Fort Wayne was not a party in *Mishawaka*, the issues which pertain to defendant's activity in Fort Wayne were not necessary to the judgment in that case and were not directly put in issue. Defendant did not have a great incentive to vigorously pursue these issues. In *The Evergreens v. Nunan*, 141 F.2d 927, 929 (2d Cir.1944), Judge Learned Hand noted that, "[w]hat jural relevance facts may acquire in the future it is often impossible even remotely to anticipate." This is just such a case. It is highly unlikely that I & M would have foreseen that the facts determined in *Mishawaka* would be used against it in an action by consumers in Fort Wayne.

*GAF* again serves as a useful counter-example. In applying collateral estoppel offensively in that case, the court emphasized that defendant was well aware of the pending action by GAF. This action, in contrast, was not filed until the day after defendant rested in *Mishawaka*, so that it would have been impossible for I & M to know of this action, *cf., Midcontinent Broadcasting Co. v. Dresser Industries*, 486 F.Supp. 858 (D.S.D.1980) (allowing offensive collateral estoppel where defendant was aware at the time of the prior action that other actions would likely follow and could have sought joinder of potential

plaintiffs) and I & M had little reason to suspect that this action would be filed. The City of Fort Wayne had promoted the lease, the people of Fort Wayne had approved it, and suits of this sort by disgruntled consumers were virtually, if not actually, unheard of. Furthermore, *Parklane Hosiery* had not been decided, so that it was not clear that offensive collateral estoppel would be available in any event.

In its brief in opposition to the application of collateral estoppel here, I & M states that *Mishawaka* was the first price squeeze case against a regulated utility to go to trial. In light of their interpretation of the law at the time, the defendants in *Mishawaka* believed that plaintiff had failed to establish several elements necessary for a finding of liability and for any award of damages. Thus, I & M and the other defendants rested at the close of plaintiff's case and presented no evidence. In *Bonsignore v. City of New York*, 521 F.Supp. 394 (S.D.N.Y.1981), the court noted the unfairness of offensive collateral estoppel in a nearly identical situation. In *Bonsignore* the wife of a New York policeman brought a wrongful death action alleging that her husband was killed as a result of the city's negligence in failing to identify the police officer who shot him as unfit to carry a gun. At trial, defendant offered virtually no defense of its psychological screening programs. The jury found for plaintiff and awarded substantial damages. The court denied the city's motion for judgment notwithstanding the verdict, but specifically noted that in light of defendant's decision not to present any evidence, it would be improper to permit the decision in that case to serve as the basis for collateral estoppel against the city in future suits. *Id.* at 402 n. 3. Many of the requirements for collateral estoppel are imposed in order to ensure that the prior determination of the issue was based on as complete and thorough a record as possible. In *Mishawaka,* as in *Bonsignore,* defendant's decision to rest without presenting any evidence led to the compilation of a one-sided and incomplete record, not the sort of

record which would serve as a competent basis for collateral estoppel.

It may be that each of the foregoing considerations would not, standing alone, show sufficient unfairness for this court to prohibit the use of offensive collateral estoppel. However, when the court considers these factors together, that plaintiffs might have been able to join in the prior action, that defendant had little incentive to litigate issues that were not essential to the prior action, that defendant could not have anticipated this action, and that the prior determination was made on the basis of a one-sided and incomplete record, it becomes clear that the use of offensive collateral estoppel in this case would be patently unfair. Thus, the court exercises its discretion to find that offensive collateral estoppel should not be allowed in this case.

### Conclusion

Accordingly, on the basis of the foregoing, plaintiffs' Motion for Summary Judgment is hereby DENIED.

### ON THE MERITS

This matter is before the court for a decision on the merits following a bench trial. The case deals with alleged violations of the Sherman Act. This court, having considered the entire record and being duly advised, hereby enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. The plaintiff class was certified by this court on July 25, 1979. At that time, the plaintiff class was defined as follows:

A plaintiffs' class is hereby certified consisting of all current residential purchasers of electricity in the Fort Wayne rate area who were formerly customers of the Fort Wayne Municipal Light Company, who became customers of the Indiana & Michigan Electric Company on March 1, 1975, pursuant to a long-term lease between the City of Fort Wayne and Indi-

ana & Michigan, and who reside, on the date of the entry of this order, within the former Fort Wayne rate area. (Memorandum of Decision and Order, July 25, 1979, at 9.)

2. The defendant, Indiana & Michigan Electric Company ("I & M"), is a corporation organized and existing under the laws of the State of Indiana. I & M is engaged in business as a public utility pursuant to the laws of the State of Indiana. In this capacity, I & M purchases and generates electric power and sells a portion of such electric power at wholesale to municipal utilities, rural electric membership corporations and cooperatives in the State of Indiana and Michigan. I & M also sells a portion of its electric power at retail to industrial, commercial and residential customers in the same area. (P–18 at 3; Trial Transcript at 166 to 204; Pre-Trial Order at 6.)

3. I & M is a subsidiary of the American Electric Power Company, Inc. ("AEP"), which is an investor-owned public utility holding company, under the Public Utility Holding Company Act of 1935. AEP owns 100% of the common stock of I & M, several other electric utility companies, and the American Electric Power Service Corporation ("Service Corporation"). AEP's subsidiary operating companies generate, transmit and distribute electric power and energy within AEP's service area of approximately 41,670 square miles in the States of Indiana, Michigan, Ohio, Kentucky, Tennessee, Virginia and West Virginia. The power plants and transmission stations of AEP's subsidiary operating companies are interconnected and their operations coordinated so that they function as a single, integrated utility system, the "American Electric Power System." One of AEP's wholly owned subsidiary operating companies is the defendant, Indiana & Michigan Electric Company. (P–22 at 64; P–23 at 66: P–465 at 23 and 48; P–466 at 3, 23 and 56; Trial Transcript at 169 to 204.)

4. The American Electric Power Service Corporation ("Service Corporation") is a New York corporation that provides management, professional and technical services, including planning, engineering, design, construction supervision, financing, accounting and other legal services, among other services, to I & M and AEP's other subsidiaries. The Service Corporation's employees participate in preparing I & M's rate filings and in proceedings before state and federal regulatory commissions. (P–22 at 64; P–23 at 66; P–465 at 48; P–466 at 48; P–454—Stark deposition, October 2, 1978, at 75 to 79; P–446—Patterson deposition, at 36 and 61 to 63; Trial Transcript at 166–191 and 620–622).

5. AEP's highest ranking officers and directors commonly serve as officers and directors of I & M, the Service Corporation, or both. Since December, 1961, the Chairman of American Electric Power Company, Inc., has also served as President of I & M and President of the Service Corporation. (P–459—Cook deposition at 8 and 9; P–445 —White deposition at 4; P–22 at 34.) A. Joseph Dowd, Senior Vice President and General Counsel of the Service Company, is also Secretary of AEP, Vice President of I & M and six other operating companies of the AEP System, and a director of thirteen System companies. (P–455—Dowd deposition at 4 to 6; Trial Transcript at 179.) William A. Black, President of I & M, has served as Vice President of the Service Corporation. (Trial Transcript at 170–171.) Gerald P. Maloney, Financial Vice President and director of I & M, also serves as a Senior Vice President for the Service Corporation. (Trial Transcript at 177–178.) Richard E. Disbrow, Vice Chairman of the Service Corporation, is also a director and Vice President for I & M. (Trial Transcript at 174 to 175.)

6. Through these interlocking relationships, AEP maintains control over the Service Corporation, I & M, and the other operating companies in the AEP system. The actions "recommended" by the Board of Directors of AEP are invariably followed by its subsidiaries. (P–455—Dowd deposition at 66.)

7. AEP consistently holds itself out as the parent of a "single, integrated electric

utility system, the AMERICAN ELECTRIC POWER SYSTEM", consisting of its subsidiaries, including I & M, and represents that customers of the AEP System benefit from the close interrelationship of the companies in the System. (P–22 at 64; P–23 at 66; P–465 at 48; P–466 at 3.)

8. In 1898, the Common Council for the City of Fort Wayne became dissatisfied with the rates charged by the existing investor-owned utility for street lighting and established a tax levy to raise money for the construction of a municipally owned and operated electric power and energy generation plant. Construction of the power plant was completed in 1909 and service to residential and commercial customers along with street lighting commenced shortly thereafter. (P–1 at 257; Trial Transcript at 108 to 109.) The Fort Wayne municipal utility thus established is known as "City Light."

9. On September 13, 1974, the City of Fort Wayne, Indiana leased its electric properties, consisting of generating, transmission and distribution facilities, as well as certain other properties employed in connection therewith, to defendant, I & M, for a term of thirty-five years. As a result of the lease all City Light retail electric customers became retail electric customers of I & M, and I & M assumed the responsibility of providing adequate and reliable service to the former customers of City Light. This lease was approved by the Indiana Public Service Commission on March 29, 1974 (P–311; P–312), and became effective March 1, 1975. (P–330; Pre-Trial Order at 6; Trial Transcript at 512–513; P–18 at 3; P–23 at 32–33; P–331; P–335.)

10. Since 1947 or 1948, when I & M succeeded Indiana Service Corporation, the investor-owned utility previously serving Fort Wayne, I & M and City Light competed in the sale of retail electric service within the Fort Wayne Rate Area. (Plaintiffs' Exhibit P–5; Fuestel, Tr. at 119.) While the areas served by City Light and I & M were not identical, there was a substantial area of overlap primarily within old corporate limits of Fort Wayne. Retail custom-

ers in this area could switch from one company to the other simply by notifying the respective utilities and executing a release. (Fuestel, Tr. at 127.) The distribution systems for City Light and I & M were shared in part. In the areas of service overlap City Light, I & M, and the telephone company jointly owned the poles which carried their respective distribution lines, each owning every third pole. (P–1 at 259, 260; Fuestel, Tr. at 127; Delaney, Tr. at 423.)

11. In 1972, City Light served 34,488 retail customers within the Fort Wayne rate area, of which number 29,648 were residential customers. (P–13 at 3.) During the same year, defendant served 45,554 retail customers in the Fort Wayne rate area, including 40,899 residential customers. (P–100.) As evidenced by I & M's efforts to acquire the City Light facilities and their ultimate success through the subject lease, I & M competed with City Light for the right to serve the entire Fort Wayne rate area. (P–54; P–55; Fuestel, Tr. at 146–151.) Defendant's interest in acquiring the right to serve all of the customers in the Fort Wayne rate area affected its pricing policy in and around Fort Wayne. (P–54 at 522, 540, 546.)

12. The relevant geographic market in this case is the former Fort Wayne rate area. (P–5; Fuestel, Tr. at 127; P–54.)

13. Prior to March 1, 1975, defendant served 57% of the retail electric customers within the Fort Wayne rate area, while City Light served 43% of the retail customers. (P–13 at 3; P–100.) After March 1, 1975, defendant served all the retail electric customers within the Fort Wayne rate area. (P–18 at 3; P–23 at 32 and 33; P–335; Trial Transcript at 132 and 619.) Clearly, defendant had a complete monopoly over the distribution and sale of retail electric power and energy within the Fort Wayne rate area after March 1, 1975.

14. Neither party has produced any evidence regarding the substitutability of electric power for other forms of energy. Both parties have proceeded in this action on the apparent assumption that the rele-

vant product market is electric power and energy. The court finds the relevant product market to be the sale of retail electric power and energy in the Fort Wayne rate area.

15. From 1935 until March 1, 1975, City Light's residential electric rates were "almost identical" to that of I & M and its predecessor in Fort Wayne. (Fuestel, Tr. at 119–121.) The rates I & M charged within the Fort Wayne rate area were different from the rates it charged elsewhere in its service area. For residents who consumed less than 1000 kilowatt hours per month, the Fort Wayne rate was lower. For residents who consumed over 1000 kilowatt hours per month, I & M's rates outside Fort Wayne were lower. (Sands, Tr. at 232; Fuestel, Tr. at 119–121.)

In setting its rates, City Light consistently sought to maintain essentially the same residential rates as I & M. When I & M secured approval of a new "RC" rate, City Light immediately sought permission to establish the same rate for its service in Fort Wayne. (Id. at 137.) City Light followed this same practice with respect to all of I & M's rates. Soon after I & M was granted its first retail electric rate increase in March of 1972, City Light petitioned the Indiana Public Service Commission for and obtained a rate increase to the level charged by I & M. The court finds that had City Light remained in operation after February 4, 1977 when the Public Service Commission abolished I & M's rate differential for residential customers inside and outside City, City Light would have increased its residential electric rates to the same level as those approved for I & M; and plaintiffs, had they remained customers of City Light, would have sustained no injury because they would have paid the same rates as I & M's residential customers.

16. After March 1, 1975, when the lease became effective, the relationship between I & M's residential rates in Fort Wayne and those outside Fort Wayne remained essentially the same. However, in an Order dated January 31, 1977, the Indiana Public Service Commission found that the lower rates for I & M's residential customers in Fort Wayne were "patently unfair and discriminatory to those residential customers residing outside the Fort Wayne Rate Area"; that "it is not less expensive to serve the Fort Wayne Rate Area residential customers," and that, "[w]e [the Commission] must change the rates as they apply to the Fort Wayne Rate Area...." (P–414 at 20–21.) Thus, the Commission ordered that I & M file a uniform rate for all of its residential customers regardless of geographic location. (P–414 at 26.)

17. In two emergency retail rate increases filed after the effective date of the lease, which amounted to a 27.52% "across-the-board" increase (P–414 at 12–13), I & M maintained the previously existing differential. In these proceedings, however, there was no opposition to the maintenance of the differential. The filing which the Commission rejected in 1977 was also made on the basis of maintaining the differential (Stark, Tr. at 332–3), but in that proceeding the City of South Bend and the Citizens Energy Coalition intervened and protested the differential. (Id. at 333.) This was the first time the differential had even been questioned. (Id. at 335–336.)

18. The court finds that the abolition of the differential in I & M's residential electric rates was not the result of any anticompetitive activity on the part of I & M, but rather was the direct result of the finding of the Public Service Commission that such differential was "patently unfair and discriminatory" in its January 31, 1977 Order in Cause No. 34588, and its mandate under that Order that such discrimination cease. (P–414 at 21, 26.)

19. In 1952 City Light generated all the power it sold. But in December of that year the demand on the system hit the forty megawatt peak of City Light's generating capabilities. Thus, City Light entered into negotiations to purchase maintenance power, that is, the amount of power City Light would need to substitute for a generator that was being overhauled. As a result of these negotiations, City Light

entered into a contract to purchase maintenance power from I & M. (Cunningham, Tr. at 597–598.) As City Light's demand increased and its generating capabilities decreased, it purchased more and more power from I & M, so that by 1963 it was purchasing nearly half of its power from I & M. (Fuestel, Tr. at 123; P–123 at 2.)

20. Even in the early 1950's City Light's generating facilities were old and inefficient. The Lawton Park Generating Station was putting a kilowatt on line at 15,000 to 15,500 BTUs (British Thermal Units) per kilowatt, while a modern plant at the same time could put a kilowatt on line at less than 10,000 BTUs per kilowatt. (Cunningham, Tr. at 595–597.)

21. Because of the deficiencies in City Light's power generation capabilities, the consulting firm of Commonwealth Associates, Inc. was retained to develop a recommendation for the expansion and modernization of City Light's generation facilities. Commonwealth Associates, Inc. recommended the addition of two 22,000 kilowatt generators to the City Light power plant. (Fuestel, Tr. at 123–124, 145–146.) In 1965, this recommendation was submitted to the Common Council for the City of Fort Wayne. The Common Council was evenly divided on the proposed expansion: four favored it, four opposed it, and one, Councilman Edward Rousseau, "swung back and forth." (Fuestel, Tr. at 147.) Mr. Fuestel and others at City Light argued in favor of the expansions, while other groups, including I & M, argued against it. At first the Common Council approved contracts for the construction of two 22,000 kilowatt generators, but when it came time to approve the bond ordinance necessary to finance this undertaking, Rousseau changed his mind and voted against the bond. With the bond ordinance rejected, the contracts became invalid, and the proposed expansion was dropped and never reconsidered. (Fuestel, Tr. at 123–124, 147; Cunningham, Tr. at 599–600.)

22. Advocates of both positions on the proposed expansion of City Light were given a full and fair opportunity to present their respective viewpoints to City's Common Council, and to the Fort Wayne community. There was at least one "public meeting" held, which assumed the form of a "public debate," in which each side was given an "equal opportunity" to make its presentation to the community. Those advocating implementation of the Commonwealth Associates proposal were not restricted in presenting their point of view, either to the Common Council or to the community. During this period, a second consulting study, the Solberg Study, also came into existence. This study, apparently commissioned by the Common Council, recommended against implementation of the Commonwealth Associates proposal. Each side, however, was given a fair opportunity to air its criticisms of the other side's consultants. In the opinion of Fred Fuestel, C.V. Sorenson, a former Vice President of I & M who opposed implementation of the Commonwealth Associates proposal, was particularly influential in convincing Councilman Rousseau to change his vote. (Fuestel, Tr. at 147–151.) Mr. Sorenson and others identified with I & M were fair and open in their opposition to the Commonwealth Associates proposal. (See P–138 through P–142.) As stated by Mr. Fuestel, an advocate of the proposal, "we [City Light] always thought C.V. was fair, yes." (Fuestel, Tr. at 151.)

23. The evidence presented in this cause is totally devoid of any indication that I & M utilized any anticompetitive or unlawful practices in its opposition to the Commonwealth Associates proposal. The evidence indicates that I & M was fair and above board in expressing its opinion on the wisdom of the Commonwealth Associates proposal.

24. After the Common Council voted to reject the funding for the Commonwealth Associates proposal, City Light entered into a second purchased power agreement, with I & M, on May 19, 1966. (P–9.) Under such agreement, I & M agreed to provide City Light with firm capacity up to 55,000 KWH, with additional capacity up to a limit of 100,000 KWH, under certain con-

ditions. (P–9 at 3.) The provisions for maintenance power were continued. (*Id.* at 5–6.) In addition, the May 19, 1966 agreement called for the formation of an "Operating Committee," comprised of representatives of City Light and I & M, to "cooperate and agree upon all matters relative to this Agreement which are not specifically provided for herein." (*Id.* at 6–7.) The second agreement was to run until June 30, 1977, and thereafter for successive periods of one (1) year, up to a maximum of twenty-five (25) years. (*Id.* at 3–4.)

25. City Light and I & M did indeed cooperate fully together, without difficulty, under such Agreement, and otherwise, from its inception to the effective date of the lease on March 1, 1975. In fact, no witness who testified in this cause could recall a single instance in which City Light called on I & M for assistance, and in which such assistance was refused. I & M provided emergency equipment when City Light had outage problems (Kopper, Tr. at 510), and always provided extra power when City Light needed it (Cunningham, Tr. at 612–613), even when City Light was late in requesting it. (*Id.*)

26. After the Common Council rejected the funding for new generators in 1965, City Light's generation facilities continued to deteriorate so that by the early 1970s the power plant had fallen into a state of serious disrepair. (Cunningham, Tr. at 601–603.) Plaintiffs conceded that the Fort Wayne municipal power plant "was in very, very poor condition, and in fact, went out of service in October, 1974." (Tr. at 596.) In the opinion of Fred Fuestel, City Light would have been better off if it had shut down its power plant in 1970 or 1971. By that time it would have been cheaper to buy all of its power than to continue operation of its inefficient and dilapidated generation facilities. (Fuestel, Tr. at 151–153.) City Light was clearly not viable as an electric power generating utility at the time the lease went into effect. Its only possibility for survival was as a distribution utility. (Fuestel, Tr. at 854–855.)

27. City Light would have encountered serious technical difficulties in distribution had it purchased all of its power from I & M. City Light had a 13,800 volt distribution system and the power purchased from I & M came in at 34,500 volts. City Light lacked the capacity to step down the incoming voltage and service its entire area. In order to accomodate the new power City Light would have been forced to invest in new substations or other expensive distribution facilities. (Cunningham, Tr. at 606; Fuestel, Tr. at 152.)

28. City Light was also experiencing problems in its meter reading, billing and disconnection procedures. Due to the antiquated nature of its distribution system, serving older parts of Fort Wayne, as, for example, the area from Pontiac to Lewis Street on Hanna, meters had to be read in dark (often locked) basements and other remote places, often difficult for meter readers to get to. Because of strange interconnections existing between customers, City Light sometimes found that it could not cut off a non-paying consumer without also cutting off a paying customer. (Trask, Tr. at 551–552.) In order to rectify such problems, substantial expenditures would have been required to "put in outside remote readers" which would have saved City Light $100,000 a year in meter readers' wages. (*Id.* at 553.) When Mr. Trask proposed such improvements, however, he "never got it on the front burner." (*Id.* at 553.)

29. As the condition of City Light's generation facilities continued to decline after the Common Council rejected funding for the Commonwealth Associates proposal, City Light's needs for purchased power increased steadily. Under its 1966 contract with I & M, the City of Fort Wayne was obligated to buy from I & M all the electric energy required by it or its customers over and above the amount that it generated. (P–19 at 1; *see also* P–7 at 1.) Between 1970 and 1974, City Light purchased over 80% of its electric power and energy requirements from defendants at wholesale:

| | CITY LIGHT'S TOTAL REQUIREMENTS | PURCHASE POWER FROM I&M | CITY LIGHT GENERATION | PERCENTAGE OF POWER PURCHASED FROM I&M |
|---|---|---|---|---|
| 1974 | 425,351,000 KWH | 377,290,000 KWH | 48,061,000 KWH | 89% |
| 1973 | 432,918,000 KWH | 369,792,000 KWH | 63,126,000 KWH | 85% |
| 1972 | 422,378,000 KWH | 352,586,000 KWH | 69,792,000 KWH | 83% |
| 1971 | 405,950,000 KWH | 311,524,000 KWH | 94,426,000 KWH | 77% |
| 1970 | 390,023,000 KWH | 295,747,000 KWH | 94,276,000 KWH | 76% |

(*See*, P–11 at 22; P–12 at 14; P–13 at 22; P–14 at 431; P–15 at 431.)

30. City Light had no realistic alternative to the purchase of power from I & M to satisfy its power requirements. As the court has already noted (paragraph 26, *supra*), City Light's generation facilities were old, inefficient, in a state of serious disrepair, and suffering from long-standing neglect. After 1970 or 1971 City Light would have been better off if it had not used these facilities at all. (Fuestel, Tr. at 152–153.) The necessary modernization and expansion would have required a substantial investment of capital, and the Common Council was not convinced that it could pay off the bond issue necessary for such an investment. (Cunningham, Tr. at 604.)

31. The distribution of electric power and energy is commonly recognized as a "natural monopoly." (Landon, Tr. at 709, 712; defendant's Exhibits PPP and XX.) In a natural monopoly the economics of scale are such that only one server can efficiently provide service. Free competition between servers in such a market will inevitably lead to one surviving server for the area. (Landon, Tr. at 706–707.) In the electric power distribution industry, large capital investments are required to set up the transmission systems, and in order to compete for service to the same customers each competitor must duplicate the other's efforts. Although the agreement between City Light, I & M and the telephone company on pole ownership (see Finding 10, *supra*), helped to eliminate some of the duplication of costs here, each utility had to bear the expense of installing and maintaining its own lines. The court finds that if I & M and City Light had continued to compete freely, only one would have survived. The distribution of electric power in the Fort Wayne Rate Area is a "natural monopoly."

32. Since City Light was I & M's only competitor in the Fort Wayne rate area, I & M was naturally interested in its pricing policy and financial performance. Thus, I & M closely followed the rate structure of City Light and other municipal utilities (P–191; P–193; P–194; P–197; P–198; P–200; P–201), and took note of City Light's financial condition as shown in its annual reports. (P–190; P–192; P–195; P–196.) Similarly, City Light made comparisons of I & M's rates and customers and the rates of nearby municipal utilities. (Fuestel, Tr. at 110.) I & M monitored City Light's rates and financial performance in order to compete with them more effectively, not for the purpose of subjecting it to a price squeeze or for any other anticompetitive purpose.

33. Apparently realizing that only one electric utility would likely survive competition in the Fort Wayne area, I & M sought to be the survivor. From the early 1960s, I & M sought to become the supplier of electricity for all customers in the Fort Wayne rate area. (P–54.) In a memorandum, dated July 30, 1965 from Paul Emler, Vice President of the Commercial Department for the Service Corporation (Strak, Tr. at 175), to Donald C. Cook, then President of I & M and Chief Executive Officer of the entire AEP system, Mr. Emler performed a detailed analysis of the Fort Wayne situation and made recommendations on how best to carry out I & M's overriding objective of becoming the sole utility for the area. (P–54.) Other top management personnel in the AEP system considered the "Fort Wayne Dilemma" and

formulated plans to fulfill defendant's policy. The Fort Wayne situation even served as a case study in an AEP management course at the University of Michigan with the hope that such study would provide some fresh ideas on the subject. *Id.* While it is clear that I & M long desired to become the sole provider of retail power and electricity in the Fort Wayne rate area, there is no evidence to show that I & M engaged in any unlawful or anticompetitive conduct in order to obtain this position.

34. The first discussion of any acquisition of City Light's facilities by I & M took place in August of 1972 at a meeting between Ivan Lebamoff, then Mayor of the City of Fort Wayne, and Robert Kopper, then Executive Vice President of I & M. (Kopper, Tr. at 496.) Lebamoff first proposed the sale of City Light to I & M; but Kopper did not believe that a sale "would meet the public favor" (*Id.* at 497), and suggested a lease. Kopper also informed Lebamoff that I & M had a policy of requiring an official request from a municipality before it would undertake any investigation or make any proposal regarding the acquisition of a municipal utility. (*Id.* at 500.) In accordance with this policy Mayor Lebamoff formally requested a lease proposal from I & M in a letter dated August 24, 1972.

35. After receiving Lebamoff's letter of August 24, 1972, I & M initiated a study as to the feasibility of leasing City Light's electric properties. (*Id.* at 502–504.) The study resulted in a proposed lease which became the basis for protracted negotiations, between representatives of I & M and Fort Wayne. After many months of negotiating, and after at least one lengthy break down in the negotiations over the "rate" clause (P–330; Article XVI), a mutually acceptable Lease Agreement was finally negotiated between the City and I & M. This lease was approved by the Board of Public Works of the City of Fort Wayne (P–309), ordered submitted to the voters of the City by the Board of Public Works (P–309) and the Common Council of the City (P–310), approved by the Indiana Public Service Commission pursuant to Public

Law 61, Acts 1973 (Ind.Code Ann. § 8–1–2–84 (Burns)), and by the voters of Fort Wayne in a referendum election held May 7, 1974 (P–324; P–325), modified by a letter agreement between Fort Wayne and I & M dated September 12, 1974, and finally became effective March 1, 1975.

36. Shortly after negotiations over the lease began, Lebamoff commissioned Bernard T. Perry, Fort Wayne's financial consultant, to analyze the lease from a financial point of view. After several months of study, Perry issued a lengthy and detailed report dated March 21, 1974, in which he recommended that the lease be adopted. "Given the condition of the utility financially and physically and given the price which Indiana & Michigan undertook to pay, I [Perry] concluded that the investment alternatives of the city were best served by entering into a lease." (Tr. at 440.) Perry found that under the terms of the lease, Fort Wayne's rate of return on its electric properties could be increased from less than 0.27% to more than 13.47%. (Defendant's Exhibit W at 17, 18.) Among other things, Perry concluded that the lease was preferable to City Light's becoming a "distribution utility," that is, buying all its power from I & M at wholesale and reselling such power to its retail customers. City Light's engineering department informed him that if it were to operate solely on the basis of purchased power, substantial capital expenditures would be necessary for improvements to its transmission and distribution system, including new substations, improvement in the voltage of the outside loop, repairs to standby generating facilities, improved metering, better voltage regulation, and higher transmission voltage. (Perry, Tr. at 440, 441; *see* Cunningham, Tr. at 606.) As one of his conclusions, Perry stated:

The competitive electric rate structure in the Fort Wayne rate area, the cost of purchased power, the current inflation bias in the U.S. economy, the state of efficiency of City Light property and plant, its deficient earning power and rate of return, all are sufficiently nega-

tive factors to preclude City Light from continuing as a strong and profitable business enterprise for long in the foreseeable future. (Defendant's Exhibit W at 2.)

Former Mayor Lebamoff's testimony that this report was commissioned with the assumption that its conclusions would support the lease (Lebamoff, Tr. at 274), was contradicted by Perry's testimony that he was not directed to "slant" the report. (Perry, Tr. at 437–438.) The court finds this report to be a fair and objective appraisal of the merits of the lease. At the time the lease was being considered, two other reports came out in favor of it, one by "Facts for Fort Wayne," an ad hoc citizens group organized by Robert Kopper to sell the lease (Williams, Tr. at 377; Lebamoff, Tr. at 278; Trask, Tr. at 562), and the other by "Taxpayers Research Association." (Defendant's Exhibits Y and Z.) During the time the lease was being negotiated and submitted to the voters and various agencies for approval, neither Mayor Lebamoff nor anyone else connected with the City of Fort Wayne suggested that I & M had subjected City Light to a "price squeeze" or otherwise taken any other anticompetitive actions to pressure Fort Wayne into leasing the City Light properties to I & M. (Kopper, Tr. at 505; Williams, Tr. at 401; Trask, Tr. at 569–570.)

37. Mayor Lebamoff's primary interest in the lease was the prospect of using it as a means to further his plans for the rejuvenation of downtown Fort Wayne. (P–291; Lebamoff, Tr. at 261–272, 306; see P–268.) I & M owned a certain parcel of real estate in downtown Fort Wayne, known as "the hole" or the old Wolf & Dessauer site, which he considered to be of central importance to the rejuvenation of the area. Lebamoff testified that if someone else had owned the property he would have put pressure on them to develop it. (Lebamoff, Tr. at 272.) Thus, in a letter dated October 3, 1973, Lebamoff requested a commitment to the development of this site as a condition for continued negotiations toward the leasing of City Light. (P–291.)

I & M had informed Lebamoff that it needed a new office for its headquarters to replace its inadequate facilities on Spy Run Avenue. Several sites were under consideration in and around Fort Wayne as well as in other cities. (Kopper, Tr. at 506; Lebamoff, Tr. at 270–271; P–459 at 79–80.) If I & M were to acquire the 30,000 to 35,000 customers then served by City Light, it would require a new and better facility in Fort Wayne to accomodate additional personnel and provide for the additional services required by these new customers. Thus, I & M committed to construct a new office building in downtown Fort Wayne if the lease of the City Light facilities were effectuated. (P–295; P–323; P–307; Kopper, Tr. at 507–508.) I & M kept this commitment and constructed a new office headquarters on the old Wolf & Dessauer site, presently known as "One Summit Square," at a cost of over $50,000,-000. (Stark, Tr. at 837.)

38. I & M's negotiations and representations with regard to their options in building a new headquarters did not constitute a "threat" to move out of Fort Wayne unless they acquired City Light. I & M's activities in this regard were in no way coercive, anticompetitive, or otherwise improper.

39. On June 13, 1972 defendant petitioned the Federal Power Commission (FPC) for a change in the rate structure applicable to its municipal and wholesale customers. (FPC Docket No. E–7740; P–238.) The evidence is in conflict as to when these rates (rate "WS") went into effect, but the better evidence shows and the court finds that the Commission ordered these rates collected subject to refund as of December 14, 1972. (P–254 at 5; Testimony of Louis Jahn, at 635; but see P–247.) These rates went into effect before the FPC ruled on whether they were just and reasonable. (P–254 at 5.)

40. The City of Fort Wayne intervened in the proceedings conducted by the FPC concerning defendant's wholesale rates for electric power and energy in Docket No.

E-7740. (P-243; P-246; P-254 at 2 to 3.) On August 19, 1976 Administrative Law Judge George P. Lewnes issued his Initial Decision finding that "the changes in rates and charges, and in the tariff and tariff provisions affecting such rates and charges, proposed herein by I & M, ... have not been shown to be just and reasonable; and they are, therefore, found to be excessive." (P-254 at 76.) This decision was based on his finding that I & M's petition was flawed in several respects, none of which were at all related to any alleged price squeeze caused by these rates. Indeed, because of the state of the record, Judge Lewnes specifically eschewed any such finding. The evidence offered by intervenors on the "price squeeze" issue was admitted only because it might have relevance to other issues. Because *Conway Corp. v. FPC*, 510 F.2d 1264 (D.C.Cir.1975), *aff'd.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), was still pending, the Commission stated that it would be premature to address this issue and the presiding Administrative Law Judge prohibited any cross-examination on it. In view of this ruling the parties not only refrained from cross-examination but also withheld witnesses on the issue. Judge Lewnes thought that a decision on the price squeeze issue based on such a record would deny due process to both sides. (P-254 at 31.)

41. As a result of Judge Lewnes' Initial Decision in FPC Docket No. E-7740, defendant entered into a settlement agreement with those affected by the WS rate at issue there. (P-255 to P-257; P-262 to P-264.) City Light received a refund in the amount of $800,184.09 under the terms of this settlement. (P-264.)

42. In the electric power industry, consumers must purchase enough power to satisfy their maximum demand and suppliers must generate or purchase enough power to cover their maximum demand. The fact that these peak demands can occur at different times gives rise to what is known as the load diversity effect. Because of load diversity a wholesale supplier of electricity can sell more power than it buys. Dr. Landon illustrated this principle by way of the following example. If a supplier has four customers whose maximum demands are 12 kilowatts (KW), 6 KW, 4 KW, and 4 KW, but the greatest total demand from these customers at any particular time (maximum coincidental demand) is 20 KW, the supplier can charge for 26 KW (i.e., 12 + 6 + 4 + 4), but must purchase only 20 KW. (Defendant's Exhibits MMM and NNN; Testimony of Dr. Landon, 757–760.) Because of this effect, a utility which buys power in bulk at wholesale and sells it at retail, like City Light, can set its retail prices below its wholesale costs and still make a profit. (Defendant's Exhibit OO at 2.) Thus, a straight comparison of the billing rates between a wholesale consumer and industrial consumers of comparable size, without considering the effects of load diversity, does not give any indication of the competitive position of the wholesale consumer.

43. Mr. Jahn testified on the effect of diversity on rate setting by suppliers of electricity. Since the coincidental demand peak determines how much power the supplier must produce, in cost of service based pricing, the supplier attempts to recoup from each consumer what it cost to produce the power required by that consumer at the coincident demand peak. While the revenue the supplier must receive is set by the amount of power the consumer class demands at the time of the supplier's system peak, the amount of power the supplier can sell is determined by the consumer's maximum demand. Thus, if one customer's maximum demand is four times greater than its coincident demand, the supplier can charge that customer one-fourth the rate that the supplier would have to charge a consumer whose maximum demand occurred at the same time as the supplier's peak. The charge to a particular customer depends on the ratio between the customer's peak demand and the customer's demand at the time of the system peak (the "diversity ratio"). The diversity ratio will also indicate what the relationship between various consumers should be. If, for ex-

ample, the diversity ratio of customer class A is four times greater than the diversity ratio of customer class B, the rate charged to B should be four times greater than the rate charged to A. (Jahn, Tr. at 638–648; Defendant's Exhibit OO.)

Mr. Jahn conducted a study to determine the diversity ratios of City Light and I & M's industrial customers during the period July 1973 to June 1974. This study showed that industrial consumers had a diversity ratio (1.29) which was 25% greater than City Light's diversity ratio (1.03). (Defendant's Exhibit OO at 4; Jahn, Tr. at 652–654.) On the basis of the foregoing analysis Jahn concluded that the rate for City Light should have been 25% higher than the rate charged to industrial customers. (Jahn, Tr. at 653–654.)

Jahn then conducted a comparative billing analysis to determine if City Light was charged a proper rate, based on a comparison with the industrial rates in effect at the time. He first determined what City Light would have paid had it been billed at the industrial rates and then made the same calculations on the basis of a rate 25% greater than the industrial rate. Jahn found that City Light should have been billed over $400,000 more than it actually was billed under the WS rate. (Defendant's Exhibit OO at 8.) If the settlement refund is taken into account, City Light's underpayment is that much more pronounced.

44. Under both a transfer price analysis and a rate of return analysis, the rate structure in effect before the lease did not impose a price squeeze on City Light. Mr. Dennis Crill performed a study of the rate of return earned on I & M's wholesale and retail rates for the year ending June 30, 1974, a period of particular relevance as it immediately preceded the consummation of the lease on September 13, 1974. (Defendant's Exhibit QQ.) This study shows that defendant earned a significantly lower return on its investment for its service of City Light and other municipal electric utilities than it did from its retail service. During this period I & M earned a 1.17% rate of return on its service to City Light, while it earned a 6.55% return on its retail service in Fort Wayne and a 5.33% return on its retail service elsewhere in Indiana. (Defendant's Exhibit QQ; Crill's testimony 687–695.)

Mr. Crill also performed a study in which he determined the rates of return I & M would have earned on its retail service if it had purchased its power at the WS wholesale rate. (Defendant's Exhibit RR; Crill at 701.) This study shows that defendant would have been much better off purchasing power under the WS rate than producing it itself. (Landon at 764.) While defendant's actual retail rate of return in Indiana for the period July 1, 1973 to June 30, 1974 was only 5.54%, it would have earned a 14.64% return on its investment for its retail sales in Indiana if it had purchased its power at the WS rate. If all of I & M's retail customers were charged under the Fort Wayne rate area retail tariffs, the rate of return would have been even higher, 16.92%. Mr. Jahn conducted a study in which he took the total amount I & M received from various classes of customers, divided that amount by the total kilowatt-hours that class purchased during a given year, and thereby produced the "average realization" for each class per year. This study showed that for each year from 1967 to 1975 the average revenue per kilowatt-hour from the City of Fort Wayne was lower than that from I & M's industrial, residential, and commercial customers. (Defendant's Exhibit OO; Jahn at 663.) On the basis of these studies both Jahn and Landon agreed that I & M's price structure did not prevent City Light from earning an adequate profit (Jahn at 659–660, 663–664; Landon at 764), and that City Light was not subject to a price squeeze. Plaintiffs have offered no evidence to refute the analysis of Messrs. Jahn and Landon.

45. The court finds that City Light's difficulty in operating at a profit during the years that the WS rate was in effect was due to its own inefficiencies and not to a "price squeeze" imposed by I & M.

46. Defendant's activities with respect to its acquisition of City Light has had a substantial effect on interstate commerce.

a. Prior to the lease agreement, City Light purchased coal in Kentucky and West Virginia which was transported to Fort Wayne in the stream of interstate commerce. (P–463(a) to P–463(e); Trial Transcript at 237 to 240.)

b. After the lease agreement, City Light no longer purchased coal outside the State of Indiana. (Trial Transcript at 254 to 255.)

c. On March 1, 1975, defendant was an energy deficient company and was required to purchase power outside of the State of Indiana. (P–37 to P–40; Trial Transcript at 309 to 315.) As a result of its acquisition of 33,000 new retail customers on March 1, 1975, defendant was required to increase its purchases of electric power and energy outside the State of Indiana to service its new retail customers.

### Discussion

■ In order to prevail on a monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2,[1] plaintiffs must prove the following elements:

(1) the relevant market,

(2) defendant's possession of monopoly power in that market,

(3) defendant's misuse of the power by anti-competitive behavior or otherwise, and

(4) injury to the plaintiffs resulting from the misuse of monopoly power. *GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1213 (S.D.N.Y.1981). *Accord Juneau Square Corp. v. First Wisconsin National Bank*, 624 F.2d 798, 813 (7th Cir.1980).

■ Before the court may address the merits of plaintiffs' action, it must first be satisfied that it has jurisdiction. Jurisdic-

tion under the Sherman Act requires that defendant's behavior substantially and adversely affect interstate commerce. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). As the Court stated in *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974), "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." In *Rex Hospital, supra,* a proprietary hospital alleged that a nearby non-profit hospital conspired with others to prevent the plaintiff's relocation and expansion. The Court found the jurisdictional test satisfied by allegations that plaintiff purchased supplies from out of state sources, received revenues from out of state insurance firms, remitted management fees to its out of state parent corporation, and intended to borrow from out of state lenders to finance some of its planned expansion.

The evidence here shows that before the lease City Light purchased substantial amounts of coal from out of state. This flow of goods terminated when the lease went into effect. Furthermore, before I & M acquired City Light's 33,000 former customers, it needed to buy power from out of state. In order to serve these new customers, I & M had to substantially increase its out of state purchases of power. Thus, the court finds that plaintiffs have established that defendant's acquisition of City Light had a substantial effect on interstate commerce and that, therefore, this court has jurisdiction.

### 1. The Relevant Market.

■ In *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir.1977), the court stated that, "In determining what constitutes a relevant market for antitrust purposes, the goal is to delineate markets which conform to areas of effective compe-

---

1. Although plaintiffs originally may have raised claims under section 1, this court dismissed those claims from this suit in its order of May 31, 1979 and thus any section 1 claims raised are no longer in this suit. Plaintiffs acknowl-

edged that point in their trial brief by their not discussing any section 1 claims, defenses, or law and discussing only the section 2 claim which is the actual subject of this lawsuit and judgment. This suit is not a section 1 suit.

tition and to the realities of competitive practice." *Id.* at 710. The defendant here has not even suggested that some other product is sufficiently interchangeable with electric power and energy that it should be considered part of a larger market. The evidence shows that I & M competed with City Light to provide electric power and energy to the residents of the Fort Wayne rate area both on an individual level to serve each particular consumer and on a "franchise" level, i.e., for the right to serve the entire rate area. *See City of Mishawaka v. American Electric Power Co.,* 465 F.Supp. 1320 (N.D.Ind.1979), *aff'd.,* 616 F.2d 976 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981). Thus, the relevant market in this case is the retail sale of electric power and energy in the Fort Wayne rate area.

### 2. *Monopoly Power.*

After I & M acquired City Light's former customers by virtue of the lease, it served all retail consumers of electric power and energy within the Fort Wayne rate area. Given this 100% market share, it is axiomatic that I & M has a monopoly over this market. *Otter Tail Power Company v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *City of Mishawaka v. American Electric Power Company, Inc., supra.*

I & M also had monopoly power over the wholesale supply of electric power and energy in the Fort Wayne rate area. I & M supplied 80% of City Light's raw power requirements during the years 1970–1974 and in 1974 itself the figure was 89%. City Light had no realistic alternative but to purchase its bulk power requirements from I & M. There has been no suggestion that service from any other generating utility was feasible and City Light's own generating facilities had so deteriorated as to preclude the option of self-generation. Thus, the court finds that defendant had a monopoly over City Light's supply of electric power and energy. *City of Mishawaka v. American Electric Power Co., supra,* at 1325–1326.

### 3. *Abuse of Monopoly.*

Plaintiffs allege that defendant abused its monopoly power over plaintiffs' supply of electric power by subjecting City Light to a price squeeze. The term "price squeeze" has been defined as a situation where "a wholesale supplier, who also sells at retail, charges such high rates to its wholesale customers that they cannot compete with the supplier's retail rates." *City of Batavia v. F.E.R.C.,* 672 F.2d 64, 86 n. 50 (D.C.Cir.1982), *quoting* Hjelmfelt, *A Price Squeeze Theory for Implementation of Federal Power Commission v. Conway,* 50 U.Colo.L.Rev. 459 (1979). *See also* testimony of Louis Jahn, Tr. at 625. Plaintiffs seek to establish the existence of a price squeeze here by showing that City Light was billed more under the wholesale rate in effect from December 1972 to March 1, 1975 than it would have been billed under the then applicable retail rate for industrial customers. Defendant argues that such a straight billing analysis is inappropriate in the electric utility industry and suggests that a transfer price analysis or a comparative rate of return analysis would be better tests for the existence of a price squeeze. In a transfer price analysis the court asks whether the vertically integrated company could have made a profit by selling at its own retail rates if it had purchased at its own wholesale rates. If it could have made a profit under these assumptions, there was no price squeeze. *See United States v. Aluminum Co. of America,* 148 F.2d 416, 436–38 (2d Cir.1945); *Illinois Cities of Bethany v. F.E.R.C.,* 670 F.2d 187, 194–199 (D.C.Cir.1981). The comparative rate of return analysis asks whether there was a cost based justification for the relationship of the rates in question. If after the wholesale and retail costs are fully allocated, the vertically integrated company's wholesale profit margin was significantly greater than its retail profit margin, an illegal price squeeze probably occurred. *City of Batavia v. F.E.R.C.,* 672 F.2d 64, 90 (D.C.Cir.1982).

The effect of load diversity seriously undermines the value of a straight compari-

son of billing rates as a tool for determining a price squeeze in the electric utility industry. As Mr. Jahn has shown, because of load diversity a utility can set its retail rates at less than the wholesale rates it pays for its bulk power and still make a profit. The transfer price and comparative rate of return tests are not similarly affected by load diversity. Thus, the court finds that these tests provide a better indication as to whether City Light's difficulty in producing a profit was the result of a price squeeze by I & M rather than its own inefficiencies or other market forces. *See City of Batavia v. F.E.R.C., supra,* at 90.

The court's decision in *City of Mishawaka v. American Electric Power Co., supra,* does not require this court to prefer the comparative billing test for a price squeeze. In that case the court found a price squeeze solely on the basis of such a test, but the court there was not presented with any alternative tests. Because defendant had not refuted that test and had offered no alternatives to it, the only evidence presented on the issue required the conclusion that a price squeeze did exist.[2] Here, the court has been presented with three different tests and has heard evidence regarding the relative merits of each. On the basis of this record, the transfer price test and the comparative rate of return tests appear to be the most accurate in determining whether or not a price squeeze occurred.

Because the transfer price test and the comparative rate of return test both indicate that I & M's rates did not constitute a price squeeze, the court rejects plaintiffs' claim that by imposing these rates I & M abused its monopoly over City Light's supply of electric power.

■ Plaintiffs' other allegations of abuse also fail. The court has found that there is simply no factual basis to plaintiffs' claim that defendant's statements regarding its need for new headquarters and the various sites it was considering should be characterized as a "threat" or as the

exercise of economic coercion. I & M's advocacy of its views concerning the proposed expansion of City Light's generation facilities in 1965 is protected by the First Amendment. Under the *Noerr-Pennington* doctrine, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), efforts to influence public officials are shielded from the Sherman Act regardless of intent or purpose. The "mere sham" exception to this doctrine, *Noerr Motor Freight,* 365 U.S. at 144, 81 S.Ct. at 533, does not apply here. The evidence does not show that the real purpose of defendant's advocacy was to interfere directly with its business relationship with City Light, rather than to influence governmental action.

In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court carved out a further exception to the *Noerr-Pennington* rule. In that case the allegations were not that the antitrust defendants sought to influence public officials, but that they "sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp the decision-making process." *Id.* at 511–512, 92 S.Ct. at 612–613. The Court concluded that if the factfinder determines that the judicial and administrative processes have been abused to bring about an illegal result, the perpetrators of this abuse cannot seek immunity under the First Amendment's protection of speech and the right to petition. *Id.* at 513, 92 S.Ct. at 613. This exception is also inapplicable here. The debate over the proposed expansion was completely free, open, and fair. Defendant's activities in no way restrained City Light from advocating its views or otherwise abused the decision-making process. Thus, plaintiffs have failed to show that defendant's acquisition of a monopoly over the retail electric power market in the Fort

---

**2.** Defendants in that case did argue that the court used the wrong rates in applying the comparative billing test, but they did not offer any alternative test. *Mishawaka,* 616 F.2d at 984.

Wayne rate area by virtue of the lease was brought about by any abuse of their monopoly power over City Light's supply of wholesale electricity.

### 4. *Injury.*

■ Even if plaintiffs had shown an abuse of monopoly power, defendant would not be liable for plaintiffs' alleged injury because plaintiffs failed to show that they were in fact injured as a direct result of defendant's allegedly illegal conduct.[3] *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 556 (7th Cir.1980); *Alberto-Culver Co. v. Andrea Dumon, Inc.,* 295 F.Supp. 1155, 1157 (N.D.Ill.1969); 15 J. Von Kalinowski, *Antitrust Laws and Trade Regulations* § 115.02[1]. "There must be concrete evidence on the issue of 'injury,' i.e., that the plaintiff was actually damaged by defendant's illicit practices. Besides actual damages, the plaintiff must also show a causal connection between the antitrust violation and the injury." Von Kalinowski, *supra,* at § 115.02[2]. Plaintiffs' proof has failed to meet this requirement.

Before the lease went into effect City Light customers who used less than 1000 kilowatt hours of electricity per month were charged less than similar I & M customers outside of the Fort Wayne rate area. Plaintiffs allege injury in the loss of this advantageous differential. Their theory is that if I & M had not acquired City Light through the lease, they would have continued to pay less than similar I & M customers outside of Fort Wayne. Before the lease, City Light consistently matched each I & M rate increase with a rate increase of its own. Plaintiffs' expert witness, Dr. Sands, assumed that City Light's rates would have continued to parallel I & M's rates. Had City Light been in existence when the Fort Wayne rate area was abolished and the differential in I & M's rates eliminated, it was more likely that City Light would have followed I & M's

price increase than maintain the differential. City Light's deteriorating condition physically and financially further reduces the likelihood that it would have maintained a lower price.

Dr. Sand's study does not prove the fact of injury. Rather, it assumes the injury, that City Light customers would have paid lower rates had the lease not occurred, and estimates the extent of injury on the further assumption that the ratio of the differential would have remained the same. His study does not consider the continued viability of City Light, a fact which the evidence put seriously in doubt, nor does it consider the projected costs of the two utilities. Thus, the court finds that plaintiffs have failed to prove the fact of injury by a preponderance of the evidence.

■ Furthermore, the loss of the differential was not caused by defendant's alleged antitrust violation. It was mandated by an Order of the Indiana Public Service Commission. Thus, in addition to plaintiffs' failure to show a direct causal relationship between the alleged violation and the alleged injury, defendant is protected by the state action doctrine.

In its order of May 31, 1979, this court rejected defendant's state action defense to plaintiffs' illegal monopolization claim on the ground that under *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the participation of the state and city government in defendant's acquisition of City Light did not immunize defendant from antitrust liability. The court further found that antitrust liability would not be inconsistent with the goals of Indiana's regulatory scheme because the Commission did not consider any possible antitrust violations in approving the lease. The court then envisioned that "the measure of damages for the illegal monopolization could conceivably be the difference between the rates charged and the rates

---

**3.** Although this trial was held on the issue of liability only, the fact of injury goes to plaintiffs' standing to sue and therefore is properly considered at this time. 15 J. Von Kalinowski, *Antitrust Laws and Trade Regulations* § 115.02. The issue of the extent of damages will not be considered at this time.

ient freedom of choice to enable the Court
to conclude that he should be held responsible for the consequences of his decision."
*Cantor*, 428 U.S. at 593, 96 S.Ct. at 3119.
In *Cantor*, the defendant private utility
sought immunity on the grounds that its
light bulb exchange program was approved
by the state public service commission and
could not be abandoned without further
approval by the commission. On the facts
presented there, the Court found that the
responsibility for the continuation of this
program lay clearly with the utility and not
with the commission. The Court concluded
that

> There is nothing unjust in a conclusion
> that respondent's participation in the decision is sufficiently significant to require that its conduct implementing the
> decision, like comparable conduct by unregulated businesses, conform to applicable federal law. Accordingly, even
> though there may be cases in which the
> State's participation in a decision is so
> dominant that it would be unfair to hold
> a private party responsible for his conduct in implementing it, this record discloses no such unfairness. *Id.*

Unlike *Cantor*, the state involvement
here was not mere approval of a program
initiated by the private party. In fact, the
opposite is true. Had the Commission approved defendant's rate filing, the differential would have continued. I & M eliminated the differential only after being ordered
to do so by the Commission. Thus, the
court finds that on this record it would be
unfair to hold defendant liable for implementing an express directive of the Indiana
Public Service Commission.

Because plaintiffs have failed to prove
several elements necessary to recover under section 2 of the Sherman Act and for
the further reason that it would be unfair
to hold defendant liable for following the
direct Order of the Indiana Public Service
Commission, this court finds that judgment
must be rendered in favor of defendant and
against the plaintiffs.

*Judgment*

It is therefore ORDERED, ADJUDGED
and DECREED by the court that plaintiffs'
requests for injunctive and declaratory relief be, and hereby are, DENIED.

It is FURTHER ORDERED, ADJUDGED and DECREED that plaintiffs
take nothing from defendant under their
Amended Complaint, that judgment be, and
hereby is, rendered for defendant, and that
costs be taxed against plaintiffs.