Virginia L. BONSIGNORE, Individually and as Administratrix of the Estate of Blase B. Bonsignore, deceased, Plaintiff,

v.

The CITY OF NEW YORK, Defendant.

No. 78 Civ. 0240 (ADS).

United States District Court,
S. D. New York.

Sept. 3, 1981.

Martin, Van De Walle & Sawyer, James
Sawyer, Great Neck, N.Y., for plaintiffs.

Allen G. Schwartz, Corp. Counsel, for defendant; Leonard A. Mentzer, Bonnie Sieradzki, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

On the morning of December 20, 1976, Blase Bonsignore ("Bonsignore"), a 23-year veteran of the New York City Police Department, shot and severely injured his wife, Virginia Bonsignore ("plaintiff"), and then committed suicide by shooting himself in the head. Plaintiff was struck by five bullets, which inflicted brain damage and caused motor dysfunction; several fragments remain in her body and brain. The weapon used in the shootings was Bonsignore's .32 caliber "off-duty" revolver, which he was obligated as a police officer to have in his possession twenty-four hours a day. Plaintiff brought this diversity lawsuit on her own behalf and on behalf of her daughters, alleging that her injuries and her husband's death were caused by the negligence of New York City in requiring Bonsignore to carry a gun.

On March 19, 1981, a jury awarded plaintiff $300,000 in compensatory damages for negligence and $125,000 in punitive damages, but rejected plaintiff's wrongful-death claim. Defendant now moves for judgment notwithstanding the verdict and, alternatively, for a new trial, on the grounds that the verdict was not in accordance with the evidence and was unreasonable as a matter of law. Plaintiff has moved for a new trial on the issue of compensatory damages, claiming that the award was inadequate. Both motions are denied.

### I. *Defendant's Motion*

Defendant faces a difficult burden in seeking to set aside the jury's verdict. This case involved complicated and somewhat ambiguous legal standards, but defendant has conceded that the jury was properly charged. Defendant's Memorandum at 26. Defendant contends, however, that the jury ignored the proper legal standard and based its verdict upon sympathy for plaintiff. *Id.* at 6.

Defendant's position is undermined by the fact that it offered virtually no defense at the trial. Defendant called no witnesses of its own; its case-in-chief consisted entirely of introducing two documents and reading additional portions of depositions already read in part by plaintiffs. Defendant cross-examined five of plaintiff's witnesses, but did not question any of plaintiff's ten other witnesses. In short, defendant asks this Court to set aside a verdict, based upon concededly valid legal principles, even though defendant declined to present a serious challenge to plaintiff's case.

Plaintiff presented a substantial body of evidence, largely unchallenged at trial, that established defendant's negligence to the jury's satisfaction. Plaintiff's witnesses described the New York City Police Department as an institution staffed by persons who scorn and mistrust psychiatrists and psychologists, and who, because of an unwritten "Code of Silence," are extremely unlikely to bring their own psychological problems, or the problems of their fellow police officers, to the attention of superiors. Moreover, plaintiff presented evidence, also largely uncontroverted, that the Police Department could have instituted reliable psychological testing of police officers at a cost of about one dollar per person, and that such tests would have revealed that Bonsignore was mentally ill and should not have been required—or even permitted—to carry a gun.

The case went to the jury on two distinct, but related, theories of negligence under New York law. The jury was instructed to find for plaintiff if it determined that the City "knew or reasonably should have anticipated that [Bonsignore's] employment posed a risk of bodily harm to others." Transcript at 805 ("Tr."). Alternatively, the jury was instructed to hold the City liable for negligence if it found that the City had failed to "adopt or implement a sufficiently effective program of psychological screening and monitoring of police officers." Tr. at 808. The jury was told that

the City has broad discretion to determine the way in which it runs its Police Department and that it cannot be found liable merely because the system that it chose seems insufficient or imperfect or because the jury would have chosen a different system. But liability could be found either if the City "failed to address itself with due diligence prior to December, 1976 to the problem of reasonably ensuring that police officers are fit to carry guns without endangering themselves or the public," or if "the measures that it adopted for that purpose were so deficient that no reasonable person could have accepted the City's judgment." Tr. at 809.

On a special-verdict form, the jury selected the second general ground of negligence by checking the box that stated: "we unanimously find defendant liable because of defendant's failure to adequately consider the problem of identifying policemen psychologically unfit to carry guns, or defendant's adoption of a program for identifying such policemen that no reasonable person would have adopted." Defendant did not object to that form. See Tr. at 883. "The language in which the jury findings were couched was meant by the Court merely to remind the jury of applicable portions of the charge and not as statements of the law in and of themselves." Defendant's Memorandum at 6.

The Court based its negligence instructions on several New York State decisions. In *Weiss v. Fote*, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960), the New York Court of Appeals held that a jury must not be allowed to substitute its own judgment for that of "a duly authorized public planning body" by determining that the interval between the times that one green traffic light ended and the next began was too brief. 7 N.Y.2d at 588–89, 200 N.Y.S.2d at 415–16, 167 N.E.2d at 68. The Court went on to state, however, that liability could be "predicated on proof that the plan either was evolved without adequate study or lacks reasonable basis." *Id.* Similarly, in *Southworth v. State of New York*, 62 A.D.2d 731, 405 N.Y.S.2d 548 (4th Dep't 1978), *aff'd*, 47 N.Y.2d 874, 419 N.Y.S.2d 71,

392 N.E.2d 1254 (1979), the Appellate Division held that New York State could not be held liable for injuries sustained as a result of an automobile collision involving drivers who had been permitted to operate motor vehicles as part of an experimental drivers rehabilitation program established by the state, absent proof that the state program "was the product of inadequate study or that it lacked any reasonable basis, or that it was improperly operated." 62 A.D.2d at 741, 405 N.Y.S.2d at 554. *See also Santangelo v. State of New York*, 103 Misc.2d 578, 584, 426 N.Y.S.2d 931, 934 (Ct.Cl.1980).

The standard by which a court must decide a motion for judgment n.o.v. is well established. The court must view the evidence, and draw all inferences, in the light most favorable to the non-moving party, and then determine whether no reasonable jury could have returned a verdict for the non-moving party. *See, e. g., Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970); *O'Connor v. Pennsylvania Railroad Co.*, 308 F.2d 911, 914–15 (2d Cir. 1962). The federal standard in the Second Circuit is virtually identical to the standard under New York law: "New York Law does not permit a reviewing court to set aside the verdicts unless the evidence so predominates in favor of the party against whom the verdict was rendered that it is clear that the jury did not reach its conclusion on a fair interpretation of the evidence...." *Billiar v. Minnesota Mining & Manufacturing Co.*, 623 F.2d 240, 247–48 (2d Cir. 1980). Viewing the evidence presented in this case in the light most favorable to plaintiff, a reasonable jury could have concluded that the plan adopted by the Police Department for screening officers was unreasonable and that defendant's negligence in adopting that plan caused plaintiff's injuries.

At the heart of plaintiff's complaint was the requirement, in effect on December 20, 1976, that all New York City police officers must carry a gun at all times when they are within city limits. Police officers were not required to obtain permits to carry guns off-duty, and Bonsignore never obtained such a permit. Tr. at 9, 109. Plaintiff's

theory was that defendant was negligent in failing to adopt a program that would have identified Bonsignore as unfit to carry a gun, and that this negligence caused plaintiff's injuries.[1] Plaintiff amply demonstrated at trial the hazards of allowing unstable police officers to carry firearms: between 1973 and 1976, when fourteen officers were killed by criminals, seventeen committed suicide and two were killed by other officers, Tr. at 365–66; these suicides were all accomplished with guns. Tr. at 365–66; see Tr. at 400. When Bonsignore joined the Department in 1953, it did not require incoming officers to undergo any type of psychological examination as to their fitness to carry guns and otherwise perform their duties. In the twenty-three years that Bonsignore was on the force, he was never given a psychological examination. Tr. at 105–08.

Much of plaintiff's evidence as to the Department's psychological evaluation of officers was supplied by Dr. Georgette Bennett, a specialist in police criminology who had served as a consultant to the New York City Police Commissioner for several years prior to the Bonsignore shooting. Bennett described several programs established by the Department to identify officers suffering from psychological problems that could interfere with performance of their duties. But the evidence was sufficient to permit the jury to find that the inherent inadequacies of these programs—particularly in light of the institutional characteristics of the Department—doomed them to failure. That the programs were deficient both in design and in implementation may have been vividly demonstrated to the jury by the facts of this very case, for Bonsignore exhibited many of the characteristics that were supposed to flag disturbed officers so that they could receive psychological help.

One of the key programs adopted by the Department was known as the "Early Warning System" ("EWS"); it was estab-

lished to identify officers who were marginal performers or had other problems. The EWS was based upon centrally maintained personnel records: staff were to examine such items as sick-leave records, complaints, recommendations, transfer reports, and performance evaluations; if problems were detected, colored dots were to be placed on the particular officers' files. A duty sergeant was to notify the commanding officer and first-line supervisor of any police officer whose file was flagged through the colored dot system. Tr. at 422–23. Bennett testified that, for a variety of reasons, the Early Warning System was ineffectual. The EWS failed in part because it had never been properly validated: that is, the Department never verified that the characteristics used to detect problem officers were appropriate and reliable. Tr. at 427. A more significant reason for the program's failure was the alleged existence of a "Code of Silence" in the New York City Police Department. The Code of Silence was an unwritten, but compelling, norm that a police officer shall not damage a fellow officer in any way. Dr. Samuel Duke, a police officer who attended law school and worked with the Labor Department's Organized Crime Strike Force, testified that the Code of Silence means that police officers take care of problems "in house", without involving any outside authorities. Tr. at 276. Duke testified that this ethic is impressed upon new recruits at the police academy and that it extends to superior officers. Tr. at 277. Bennett explained that the Department's top officials were familiar with the Code of Silence, and that she had worked with them to draft a new Code of Conduct that would make it an ethical imperative for police officers to report colleagues. Tr. at 434. Moreover, Dr. David Sternberg, without specifically mentioning the Code of Silence, testified that police officers would be unlikely to report a fellow officer who displayed the traits manifested by Bonsig-

---

1. Plaintiff's alternative theory was that the Department knew, or reasonably should have anticipated, that Bonsignore's employment posed a risk of bodily harm to others. This claim of negligence because of actual or constructive

knowledge of danger was the subject of substantial testimony at trial, but the evidence (although unrebutted by defendant) was highly speculative and circumstantial. The jury denied plaintiff recovery on this theory.

nore. Tr. at 262. This testimony as to the Code of Silence was unrebutted, and it strongly suggested that a program—such as the Early Warning System—that depended upon officers reporting other officers would never work. Thus, the jury could reasonably have concluded that the EWS was so poorly designed that no reasonable police department, genuinely interested in identifying officers with psychological problems, would have adopted it.

Plaintiff demonstrated that the EWS was deficient, not merely in theory, but also in practice. Bonsignore's illness went undetected even though he possessed many of the traits that were supposed to trigger the system. Thus, the EWS led to no scrutiny of Bonsignore, even though he had compiled a record of excessive sick-leaves, even though his superiors had not filled in performance-rating data on his evaluation forms, and even though he had been assigned to the position of precinct attendant for an unusually lengthy period of time. Tr. at 449. That last factor was illustrative of the EWS's inadequacy. At least two witnesses testified that the position of precinct attendant, or "broom" as it is called in the force, is classified as a limited-duty assignment; it usually indicates mental or physical disability. Tr. at 270–71 (testimony of Duke); Tr. at 408 (testimony of Bennett). Paragraph 21.2 of the Police Department Rules and Procedures requires the committee on personnel to investigate police officers who are assigned to limited-duty assignments for more than one year and to report its findings to the Commissioner. See Plaintiff's Exhibits 18, 50. Yet, though Bonsignore was the Nineteenth Precinct's "broom" for thirteen years, his situation was never investigated. Plaintiff thus provided ample evidence to permit the jury to conclude that the Early Warning System was operationally defective. Notwithstanding the elaborate system of colored dots, Bonsignore escaped detection and treatment despite manifesting the symptoms that were supposed to identify him as needing help.

The EWS was not the only program that the jury evaluated. Bennett also discussed a Psychological Services Unit ("PSU") established in 1973 to administer psychological tests to new recruits and to provide short-term limited counseling to troubled recruits and to provide short-term limited counseling to troubled police officers; the PSU was to refer officers with more serious problems for assistance outside the Department. Tr. at 424. Plaintiff established that—like the Early Warning System—the Psychological Services Unit, though commendable on paper, failed in practice because it did not take into account peculiar institutional mores of New York's police officers. Plaintiff's witnesses testified that, among New York City police officers, considerable stigma is attached to seeking psychological help. Duke testified that "without a doubt," "if you let the Police Department know you are getting psychological or psychiatric help, this would be a mark against you and follow you in your career." Tr. at 288. Duke knew of no one who had voluntarily sought psychological help and conceded that he had never suggested that an officer seek help or report someone else as in need of assistance. Tr. at 302. Deputy Inspector Bernard McCrann, in a deposition read to the jury, acknowledged the existence of a general attitude in the Department that going to the PSU would harm an officer's career. Tr. at 375. Bennett confirmed that a stigma was attached to psychological services and that officers feared that utilization of such services would have a negative career effect. Tr. at 460. Sternberg testified that, because of concern over job security, promotion, and self-esteem, police officers will not voluntarily seek psychological help. Tr. at 259–60. Although officer Allen Berger, stationed at the Nineteenth Precinct since 1959, testified in a deposition that "there was no hesitancy that I could think of" as to visiting the PSU, he did not know any officer who had gone to the unit, nor could he recall ever discussing the matter with any officer. Tr. at 600–02. Similarly, officer John Rafferty stated in his deposition that, although so far as he knew no stigma was attached to the PSU, he had

never discussed the unit with anyone. Tr. at 598.

The significance of police officers' reluctance to seek assistance from the Psychological Services Unit was driven home to the jury by Police Chief James Neeham. Neeham recognized that, no matter how effective a treatment system may be in theory, it will fail if problem officers are not identified. Yet a police officer's perception of himself is such that he will not recognize his own problems. Neeham thus stressed the need to "sell" psychological services to police officers, noting that in "about every case of suicide of a New York police officer or of the commission of an unnecessary act of violence on the part of a member, feedback trickles in after the fact on how fellow police officers and low-level superiors noticed some demonstrative abnormal behavior which for some reason they chose to ignore." Tr. at 441.

Plaintiff thus presented persuasive evidence that, although commendable in theory, the PSU could not be relied upon to lead to the detection and treatment of dangerous police officers. Because of the token funds allocated to the program, moreover, professional personnel from outside the Department were not hired for the PSU, thus further vitiating the program. Tr. at 491 (testimony of Bennett). The jury was therefore justified in concluding that the Police Department acted negligently in the manner in which it designed and operated the Psychological Services Unit. Other efforts by the City to identify dangerous officers were shown to be no more efficacious.[2]

At the same time, the jury heard considerable testimony as to the types of programs the Department could and should have adopted. Sternberg discussed the belief of many law-enforcement officials that police officers should be given personality tests prior to appointment. Tr. at 563. He noted that psychological screening tests had been used as early as 1938 in Toledo and in many other cities by 1955. Tr. at 563. Sternberg testified that the Minnesota Multiphase Personality Index test could have been administered to current and incoming officers, at low cost and with effective results. Tr. at 566–67. He offered similar conclusions with respect to the Rorschach test. Tr. at 569–72. Bennett, too, testified to the need for periodic screening of police officers. Tr. at 491–92, 511.

Despite plaintiff's strong evidence that the Department had failed to adopt any adequate identification program, defendant nonetheless maintains that plaintiff has failed to demonstrate that the Department was negligent in adopting the program that it chose. Defendant contends that the Early Warning System, Psychological Services Unit, and other programs were the product of careful deliberations. Yet, defendant offered little direct evidence that these deliberations took place, and it offered no evidence whatsoever that the Department reviewed these programs, once in place, to ascertain whether they were serving their intended purposes. The evidence cited by defendant in its post-trial brief to establish that the Department conducted careful deliberations is primarily the testimony of plaintiff's expert witness Bennett. Bennett testified as to her role in developing programs to deal with police violence and corruption; on cross-examination, she stated that "a lot of care went into the approach." Tr. at 489. Beyond that ambiguous statement, defendant presented no direct evidence that the Department had ever considered the problem of whether certain officers might be unfit to carry guns. Defendant did not present a single witness or document to explain the manner in which the Department was coping with problem officers. The City was in the better position to offer evidence as to its own detection programs, yet it offered none. Under these circumstances, the jury was justified in drawing an inference against defendant.

---

**2.** Bennett described a personnel screening panel, or violence task force, established to identify violence-prone officers, which worked like the Early Warning System. Tr. at 424. Bennett also described two experimental programs designed to identify officers who used excessive force or were involved in a large number of automobile accidents; the Department dropped both programs. Tr. at 425–26.

Defendant's other arguments are unpersuasive. Defendant emphasizes that even Bennett admitted that the New York City Police Department was in the forefront of developing programs to deal with police problems and violence. Tr. at 496. That statement fails to establish that the programs adopted were reasonable or were properly implemented. The jury heard testimony from Bennett and from Sternberg that other cities had developed inexpensive but effective programs for screening violent officers. For example, Sternberg noted that, as of 1955, fourteen cities with populations in excess of 100,000 had such tests, and that, for about one dollar per person, New York or any other city could administer tests that would reliably indicate whether an individual was fit to be a police officer. Tr. at 563–70. Defendant attempted to rebut that testimony by quoting a text, co-authored by Bennett, that stated that such testing was in its infancy in the 1970's. Tr. at 492–94. Bennett stated that she did not write that chapter of the book. Tr. at 495. Defendant did not call its author or any other expert.

The strongest evidence supporting defendant's case came from Bennett's answers to several questions from the bench. Bennett stated that, in 1976, 1500 of the 25,240 members of the Department were examined by a psychiatrist, psychologist, or alcoholism counselor; one-third had sought help on their own accord, and all had experienced or were about to experience an emotional breakdown. As a result of the personnel review panel and Early Warning System, moreover, 800 officers were subjected to constant monitoring. Tr. at 528. These figures do indeed suggest that the programs were effective, to at least some degree, in obtaining psychological help for problem officers. But this testimony does not establish, especially in the absence of additional evidence, that defendant's programs reached a significant portion of problem officers or that treatment, once obtained, was effective. At most, the evidence created disputed issues of fact for the jury to resolve.

■ Defendant contends that, because the jury found it liable for Virginia Bonsignore's personal injuries, but not for Blase Bonsignore's wrongful death, the verdict is inconsistent as a matter of law and must be set aside. The jury may well have concluded, however, that, while defendant's failure to adopt a reasonable program to screen violence-prone officers was the proximate cause of Virginia Bonsignore's injuries, that failure did not cause Blase Bonsignore's suicide. Plaintiff submitted substantial evidence to establish a causal link between defendant's failure to detect Bonsignore as a troubled officer and the shooting of his wife. Schwartz, Bennett, and Sternberg all testified that there was a direct connection between Bonsignore's being obligated to carry a gun off-duty and his using the gun to shoot his wife and kill himself. Tr. at 196–98, 401, 585. Moreover, the jury heard evidence that police officers are especially likely to suffer from emotional problems leading to marital difficulties and violent behavior. Tr. at 387–97 (testimony of Bennett); Tr. at 557 (testimony of Sternberg). The jury could, however, have concluded that Bonsignore would have found another way to kill himself even if he had not had a gun; or the jury could have concluded that Bonsignore's own volitional suicide superceded defendant's negligence.

■ Finally, defendant asserts that the jury's verdict was based upon sympathy for the plaintiff, not upon a fair evaluation of the evidence. This is an ironic argument on the City's part, given that it presented virtually no evidence at trial, that its attorney told the jury "you are not human, you are not really my kind of people if you didn't have sympathy for the Bonsignores," and that he then urged the jury, if it found defendant liable, to award plaintiff "a large sum of money because of the dimensions of this tragedy." Tr. at 748. In any event, defendant's claim is based upon groundless speculation. Had the jury been seized by passion, it would have awarded a vastly larger sum than it did. Moreover, the fact that the jury awarded a substantial but moderate amount for punitive damages—

after being instructed that punitive damages could be awarded only if "defendant's conduct was wanton and reckless, not merely unreasonable," Tr. at 816—suggests that the jury believed the City to have been guilty of serious malfeasance.

■ Based upon the evidence adduced at trial, defendant's motion for judgment n.o.v. could be granted only by standing the governing standard on its head; that is, the verdict in this case could be set aside only by drawing all inferences in defendant's favor and speculating whether any reasonable juror might have found defendant *not* liable. Short of such radical revision of the traditional deference toward jury verdicts, it is clear that the decision here must stand, for the verdict was amply justified by the evidence. Concededly, the testimony established that the Department was cognizant of the problem of police violence and adopted programs intended to alleviate that problem. Yet, this was not enough to discharge the City's duty under the governing standard. The jury could have found defendant liable either because the Department "failed to address itself with due diligence . . . to the problem of reasonably ensuring that police officers are fit to carry guns without endangering themselves or the public," or because "the measures that it adopted for that purpose were so deficient that no reasonable person could have accepted the City's judgment." Tr. at 809.

The jury predicated liability upon the latter rationale, and the record contains ample evidence to support the jury's finding.

Perhaps the Department could have presented evidence that its detection and treatment programs, though ultimately unsuccessful, were not so deficient as to bespeak negligence on the part of the City. But this defendant chose not to do. Indeed, the City inexplicably offered virtually no defense of its programs.[3] Having adopted that trial strategy, defendant may not now retry its case to the Court. The motion for judgment n.o.v. is denied.

■ Defendant's motion to set aside the award of punitive damages of $125,000 is also denied. Defendant did not object to the instructions on punitive damages. The jury could reasonably have found that the City's efforts to deal with police violence were so inadequate as to constitute gross and wanton negligence. Moreover, the jury could have concluded that an award of punitive damages was necessary as a deterrent, to prod the Department into adopting meaningful measures to prevent the recurrence of tragedies like this one. The amount awarded—less than half of the compensatory-damage award—was not excessive; it was a moderate but firm expression of the seriousness with which the jury regarded the insufficiency of defendant's

---

**3.** The City's defense was certainly competent, and no miscarriage of justice occurred. Defense counsel's strategy was a knowing and intelligent choice, but it may have resulted in the compilation of a one-sided and incomplete record (in addition to a decision without consideration of any comparative-negligence defense). It would be improper, therefore, to permit the decision in this case to serve as the basis for collateral estoppel against the City in future lawsuits. Although the Supreme Court has not prohibited "offensive" use of collateral estoppel—that is, where the plaintiff seeks to estop a defendant from relitigating the issues that the defendant previously litigated and lost against another plaintiff—it has indicated that where a plaintiff seeks to make offensive use of collateral estoppel a trial court must exercise "broad discretion to determine [whether] it should be applied." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–31, 99 S.Ct. 645, 650–51, 58 L.Ed.2d 552 (1979). Basic equitable

principles should be employed. Under both federal and New York law, before collateral estoppel may be applied in the second suit, "the party against whom a prior judgment is asserted must have had a 'full and fair opportunity' to litigate the relevant issues in the first suit." *Cerbone v. County of Westchester,* 508 F.Supp. 780, 785 (S.D.N.Y.1981). At least in New York, as Judge Weinfeld recently noted, "[o]ne factor in determining whether a party received a full and fair opportunity to litigate his claim is the adequacy of the representation afforded him." *Id.; see Schwartz v. Public Administrator of County of Bronx,* 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 961, 246 N.E.2d 725, 730 (1969). While the City's representation was adequate in the sense that it received a fair trial, the possibility that other evidence could be introduced at future trials would indicate that the City should be free to relitigate against other plaintiffs the adequacy of its psychological detection and treatment programs.

efforts to deal with a persistent but readily manageable problem.

## II. *Plaintiff's Motion for Retrial on Damages*

Plaintiff moves for a new trial limited to the issue of compensatory damages, contending that $300,000 is insufficient to compensate for her injuries. Plaintiff presented evidence that the present value of her lost expected earnings was $135,248. Tr. at 250. The parties stipulated that plaintiff's hospital bills amounted to $35,297 and that miscellaneous bills totalled $5,777. Tr. at 603–04. Assuming that the jury accepted those sums, it awarded plaintiff at least $123,678 for conscious pain and suffering. Determining the extent of pain and suffering, and fixing a monetary amount therefor, is a largely subjective task as to which there is no ready answer, and for which the law assumes that the jury is at least as well-suited as the court. The amount awarded here is not so unreasonable as to justify setting the verdict aside.

Accordingly, the Clerk will enter judgment for plaintiff forthwith, in the amount of $425,000, plus costs and interest accrued since March 19, 1981.

SO ORDERED.