Margaret Cygan, Individually and as Administratrix of the Estate of Frank Cygan, Deceased, Respondent, v City of New York, Appellant.

First Department, February 14, 1991

## APPEARANCES OF COUNSEL

*Philip M. Damashek* of counsel *(Damashek, Godosky & Gentile,* and *Sally Weinraub, P. C.,* attorneys), for respondent.

*Elizabeth S. Natrella* of counsel *(Pamela Seider Dolgow* with her on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for appellant.

## OPINION OF THE COURT

CARRO, J.

■ The unforeseen suicide of a police officer, who, while off duty, turns his gun on himself, is a tragedy for his family, friends, colleagues, and the public he has served. It is not however, the basis of a successful suit alleging negligence by the officer's municipal employer, for permitting the officer to carry a service revolver. This is true notwithstanding the fact that the death occurred some four months after a period during which the gun was removed during a period of psychological evaluation for reasons other than suicidal behavior, since the return of the gun cannot be considered to be either the cause-in-fact or a proximate cause of the officer's suicide.

The case at bar involves the facts and circumstances surrounding the suicide of Frank Cygan (decedent), a 14-year veteran of the New York Police Department, who shot himself to death in his home on June 9, 1985. The appeal within arises out of the wrongful death action brought by his wife Margaret Cygan (plaintiff), individually and as decedent's administratrix, against the City of New York (the City); this case resulted in a jury finding that decedent was one-third,

and the City's Police Department (the Department) two-thirds, liable for the suicide; the jury accordingly awarded plaintiff damages in the sum of $650,000 less one third, i.e., $433,333 and $325,000 each to decedent's children, Frank Junior and Theresa (also reduced by one third).

The pertinent facts in this case, while seemingly convoluted, are to our view, ultimately less complex than meets the eye. On June 9, 1985, plaintiff and decedent, correction and police officers, respectively, were off duty and spent the day at home with their two children. Plaintiff said the day was "very nice" and "happy" and that they visited both his and her parents. Plaintiff testified that at the latter of the two homes, decedent had "a couple" of beers with her brothers. They returned home at approximately 9:00 P.M., at which time decedent drank some more beer while watching television. After decedent's suicide, plaintiff gave inconsistent statements as to whether decedent was drunk or not when he got home, telling investigating police that he was already drunk, but later testifying at trial that be became intoxicated only after arriving home. In any event, she maintained that he was drunk by the time she went to bed shortly after midnight, and that she did not know whether he would sleep downstairs or upstairs.

Although plaintiff testified that she did not recall arguing with decedent while she was downstairs earlier that evening, she later, and apparently inexplicably, found herself awakened by her husband who was yelling and incoherently mumbling. She forthrightly acknowledged in her testimony that she did not pay any attention to this conduct, but simply went back to sleep.

Plaintiff's slumber was once again disturbed, this time by decedent's shouting "[t]his is for you Marge" and the sound of a gunshot. At this, plaintiff did rise and go downstairs, where she found her husband in the dining room lying next to the china closet. It is undisputed that decedent, who had had his guns removed by the Department 18 months earlier and returned to him approximately four months prior to his death, had shot himself in the head with his off-duty service revolver. It is equally uncontroverted that the autopsy subsequently performed revealed that he had a blood alcohol level of .17%, which, as plaintiff correctly notes for purposes of comparison, is substantially beyond the .10% necessary to sustain a charge of driving while intoxicated.

While this case revolves, so to speak, around decedent's off-

duty service revolver, which decedent loaded with but a single shell before shooting himself, it is significant that that was not the only gun in the house. Indeed, as the City points out, the Cygans had a "virtual arsenal of weapons and ammunition." Their abode was home to four handguns, both service and private, a shotgun, a rifle and a dagger. During the period of time in which decedent's guns were removed by the Department, he nevertheless retained and had at his disposal part, though not all, of this impressive array of weapons.

Plaintiff's central contention is that the Department knew or should have known the decedent was likely to commit suicide and that restoring his gun four months prior to his death was the proximate cause of the suicide. In this regard, she contends that, although decedent's guns were initially removed following a departmental psychological evaluation, in reality, his evaluations by numerous professionals and facilitators were conducted carelessly and with indifference, and that decedent had exhibited suicidal ideations which should not only have been identified, but precluded the return of his guns by the Department. On the other hand, the City counters that the conduct of the Department and the professional staff involved was reasonable and prudent. The City further argues that despite the fact that the suicide was not foreseeable, even had it been predictable, it was not preventable. It is therefore necessary to review the evidence concerning decedent's conduct over the period of time in question, which the parties agree to be approximately 18 months previous to the suicide.

In November 1983, plaintiff returned to work as a correction officer. Decedent, who worked on the night shift, thus had the added responsibility of caring for the children, the younger of whom was three years of age, during the day. This resulted in his getting as little as two hours of sleep each night and unquestionably caused stress in the Cygans' marriage. In addition, decedent wanted plaintiff to stay home and to have another baby, requests to which plaintiff did not acquiesce.

Moreover, according to plaintiff, in December 1983, the then 34-year-old decedent became paranoid and delusional, believing, *inter alia,* that he was under investigation because he had attended two meetings of a right-wing organization when he was 17 years old, that he would be jailed and killed while incarcerated. The situation in their household worsened, until plaintiff called the Psychological Services Unit (Psychological Services) of the Health Services Division of the Department

(Health Services). While this was the first time in nearly 13 years of service in which the Cygans sought help from the Department, plaintiff's call prompted immediate action, and an appointment was scheduled for the very next day.

On January 20, 1984, Dr. Arthur Knour, a senior psychologist in the Department, met with decedent and plaintiff, both separately and together. Decedent expressed the paranoid fears he was experiencing and told Knour he had lost his appetite and was experiencing sleeping disorders, the primary basis of which both plaintiff and decedent acknowledged was lack of time to sleep; decedent also told Knour that plaintiff's return to her job had upset him. Plaintiff, who had known decedent since 1971, told Knour that he had never expressed paranoid fears prior to December 1983.

Decedent acknowledged that he drank two six-packs of beer each day, while he was babysitting and watching television. He also said he had been drinking beer since he was 17 years old; plaintiff confirmed that he had been a beer drinker since she met him.

Plaintiff makes much of a notation made by Knour that day in his case notes recommending removal of decedent's guns. This comment—the only one which refers to suicide in the entire case history—states that "because of delusional feelings and *possible suicidal ideation,* guns removed despite fact that was self-referral" (emphasis added). However, on January 20, 1984, both plaintiff and decedent rejected any suggestion that decedent was suicidal. Furthermore, Knour testified that subsequent to January 20, 1984, there was no indication at any time warranting further concern in this regard.

Knour determined that, considering the sudden onset and severity of symptoms, decedent should consult a psychiatrist; similarly in this regard, he advised plaintiff that decedent may require medication. Knour felt, based upon his interview, that the symptoms could be transitory and dissipate quickly or could be indicative of psychosis or substance abuse. Knour's final recommendation was removal of firearms *"for the purpose of psychological evaluation",* and restricted duty "pending the results of this evaluation" (emphasis added). Knour testified that decedent did not, however, fit the profile as someone who was a risk either to himself or others. Cygan complied and turned in his off-duty service revolver and a .22 automatic gun. He also apparently turned in a shotgun the following day; we note that this still left a number of weapons in the Cygan household.

Decedent continued to work at Brooklyn Central Booking, where he did not require a gun to perform his duties. His personnel chart indicated that other than being a chronic absentee, apparently for reasons of physical illness, Cygan had received acceptable performance ratings and had not been the subject of disciplinary action.

Decedent spoke to Knour again on January 22, and saw him on January 24. He told Knour that he did not need to see the recommended psychiatrist, Dr. Cavanaugh, a doctor who was not with the Department and that, because he was starting to eat and sleep, and had also cut down on drinking, he was feeling better. Decedent acknowledged that his drinking could have an integral role in his problems and agreed to go to the Department's Counselling Unit to speak to an alcoholism counselor.

Detective Philip Gager, an alcoholism counselor in the Counselling Unit saw decedent on February 2, 1984. Decedent gave him substantially the same information concerning his drinking as previously given with one addition; he told Gager that on one sole occasion six years earlier, he had drunk beer at lunch time. Based upon this, Gager gave him a rating of "4" out of a five-point scale on a form denominated "Profile of Alcoholism" for "drinking on the job". Gager concluded that while decedent was not an alcoholic, he was possibly in a precursory syndrome which could develop into alcoholism. He therefore scheduled decedent for an alcoholism education program, which decedent successfully completed. Knour was advised of this.

Knour spoke on several occasions with decedent and plaintiff in March and April. Plaintiff told Knour that decedent had continued to eat and sleep better and had ceased verbalizing delusions. In April, Knour referred decedent to an outside psychiatrist, Dr. Abraham Pinsky, for an independent evaluation of decedent in contemplation of restoration of firearms. This was consistent with the policy of Psychological Services, as well as the requirements of both the Department and the City concerning restoration of an individual who has been on limited duty to full service.*

---

* Insofar as the City is concerned, there exists a Mayoral directive, dated September 8, 1978, which is applicable to all City agencies, regarding "Limited Duty Procedure". This directive restricts such duty to one year "except under the most unusual circumstances" where an officer could stay on restricted duty beyond 12 but less than 15 months.

Pinsky first met with and evaluated decedent on April 28, 1984. Pinsky concluded and noted that decedent had essentially remained symptom-free since January. Although decedent had lost 40 pounds, bringing his weight to 170 pounds on a 5-foot 11-inch frame, decedent and plaintiff both seemed apparently pleased by this, as decedent had been overweight. Pinsky concurred with the Cygans that the weight loss was a benefit. In July, Knour also noted the weight loss.

Pinsky determined that decedent's mental status was essentially normal and that he had experienced an "acute paranoid disorder in remission" which had been "actuated by increased stress after his wife took a job and was aggravated by his alcohol intake"; however, in view of the fact that decedent was essentially alcohol-free, coherent and nondelusional, Pinsky concluded that this had passed. While Pinsky indicated that decedent could return to full duty immediately, he recommended to Knour that they err on the side of caution, wait two months and reevaluate decedent. On May 3, Knour formally concurred with Pinsky.

The Cygans again saw Knour on July 12, 1984. Notes from that meeting yet again indicate that not only was decedent nondelusional, but in fact not depressed and even "cheerful", and that he "look[ed] good". Plaintiff advised Knour that decedent drank only moderately. Knour concluded that after eight months of being asymptomatic, it was appropriate to return decedent to full duty and restore his guns. This recommendation was formalized on September 20 in a detailed report.

Dr. Martin Symonds, the then-head of Psychological Services, reviewed the file and recommended Pinsky conduct a second evaluation. This took place on November 6, 1984. Pinsky reaffirmed his earlier findings noting some further improvement in that decedent was more humorous and articulate and less embarrassed. He accordingly recommended decedent be returned to full duty and have his guns restored.

Around the same time, Symonds also solicited the opinion of decedent's Commanding Officer, Lieutenant Vincent Gallagher. Gallagher gave an unequivocal and detailed endorsement on December 12, 1984, noting that decedent performed his duties well, had good relations with both his supervisors and colleagues and that he knew of no reason why decedent's guns should not be restored.

In January 1985, the Commanding Officer of the Health

Services, Inspector Papa, reviewed the file and conferred with Knour and Symonds. On January 21, 1985 he recommended restoration of guns and full duty noting "excessive delay [in his] receipt of the case." Decedent was restored to full duty on February 15, 1985 with final endorsements emanating from, *inter alia,* the Commanding Officer of the Personnel Bureau and the First Deputy Commissioner.

An incident occurred on January 22 or 23, 1985, 1 or 2 days after decedent's restoration was approved, which plaintiff alleges "reflects * * * irrational behavior, acting out, and drinking on the job." On the day in question, plaintiff told decedent she wanted a divorce because she was "fed up" with his jealous accusations of her. She conceded that this was the first time she had demanded a divorce. Later that night decedent was discovered by his immediate supervisor, Sergeant Vincent Cooper, and a co-worker, Officer Michael Layden, in the Central Booking kitchen drinking a can of beer at 1:00 A.M. Cooper told decedent to dispose of the beer, a command with which decedent complied, without complaint or comment. However, 20 minutes later, Cooper and Layden found decedent drinking a second can of beer. Upon being again confronted by them, decedent told them his wife had demanded a divorce.

Cooper called Health Services, who in turn contacted the Counselling Unit. At 2:45 A.M. decedent had a 10 to 15 minute discussion with counselor Arthur Tracey, who had been specifically requested because his area of expertise was marital and secondary problems. Significant in this regard is that Cooper made the call in spite of the express protestations by decedent not to do so, because he (decedent) was afraid he would not get his guns restored. We also note that Tracey's notes referred to decedent's conduct that night as being "because wife states she wants a divorce."

Decedent promised Tracey he would report for a follow-up assessment the next day. He then remained for the remainder of his tour, at which time Layden and another officer, Scott, escorted him home at 7:00 A.M. Upon arriving at the house, plaintiff yelled at him stating, in the presence of the other officers, "Frank, look at you. You are a f____g nut." Only after Layden told her to stop yelling at him did "her attitude change from anger to concern". The officers remained with the Cygans until 9:00 A.M.; before leaving, Scott called Health Services and both Cygans agreed to go to the Counselling Unit. Cooper confirmed that they kept the appointment.

The Cygans saw Tracey and he counselled them once a week until mid-February. The focus of these sessions was upon communication problems and decedent's jealousy. Tracey, who knew of the gun removal, noted that there was consistent improvement in the interaction between the couple.

On or about February 12, decedent called Tracey to cancel their appointment for that day because the family was going on vacation, which Tracey viewed as extremely positive. Plaintiff later acknowledged that they had a good time vacationing in Nassau. After returning from vacation, decedent worked, apparently without further incident, from February to June, when he died. Moreover, during this time, he continued to care for the children while plaintiff was at work. Although plaintiff asserted there were more flare-ups in their relationship, they sought no further counselling.

Both plaintiff and the City called experts to testify at trial. While they did not agree in every respect as to the dynamics of the situation, or in how the Department should have handled the restoration of decedent's guns, significantly, they were in agreement that there was no way to predict Cygan would commit suicide. Moreover, plaintiff's expert, Dr. Robert Goldstein, acknowledged that the act seemed to be one of irresistible impulse and further conceded that other than Knour's parenthetical note 18 months prior to the suicide, there were no suicidal threats or desires expressed to anyone in the Department nor, apparently, to plaintiff. Dr. Robert Berger, the defense expert, testified that if someone has a deep desire to commit suicide, even if there were no firearms present, decedent could have effected the goal by hanging, pills, gas, etc.

The jury, returning a unanimous special verdict, found that the Department should have known on February 15, 1985 that decedent was likely to commit suicide; that between that time and June 9, 1985 the Department should have been similarly aware; that the return of the guns was the proximate cause of the suicide and that there was no intervening contributing cause. Finally, the jury apportioned liability as follows: the Department—two thirds, decedent—one third, plaintiff—0.

Upon the City's posttrial motion to, *inter alia,* set aside the verdict and dismiss the complaint, the court, even while denying the City relief, expressed the reservation that "I think that this is a thin case and there are still some areas of it that cause me some concern." Upon reviewing the facts in

the light most favorable to plaintiff, as we are required to do *(Febesh v Elcejay Inn Corp.,* 157 AD2d 102, 105-106 [1st Dept 1990]; *Candelier v City of New York,* 129 AD2d 145 [1st Dept 1987]), we conclude, unlike the motion court, that plaintiff failed to establish a prima facie case of negligence.

It is classic hornbook law that negligence is "conduct which falls below the standard established by law for the protection of others against unreasonable risk." (Prosser and Keeton, Torts § 43, at 280 [5th ed].) In determining whether a breach of duty has occurred, we must consider whether the resulting injury was a reasonably foreseeable consequence of the City's conduct. *(Gordon v City of New York,* 70 NY2d 839, 841 [1987]; *Danielenko v Kinney Rent A Car,* 57 NY2d 198, 204 [1982].) Thus, insofar as the restoration of the guns is concerned, the City's liability is limited only to those foreseeable consequences that the Department's alleged negligence was a substantial factor in producing. *(Bonsignore v City of New York,* 683 F2d 635, 637 [2d Cir 1982], *affg* 521 F Supp 394 [SD NY 1981].)

The specific question becomes whether the Department's return of decedent's guns under the facts and circumstances presented was a proximate cause of decedent's suicide and ultimately whether the suicide was foreseeable. Despite our sympathy for those who have suffered as a consequence of decedent's death, and the sparse law in this area, we must nevertheless respond in the negative.

There are two situations where liability exists for the failure to prevent a suicide. One is where a facility such as a hospital or jail which is in actual physical custody of an individual fails to take reasonable steps to prevent a reasonably foreseeable suicide. *(Gordon v City of New York, supra,* 70 NY2d, at 840 [holding that the City failed to satisfy its duty of care to plaintiff prisoner where authorities knew or had reason to know of his suicidal tendencies].) The second is where an institution or mental health professional with sufficient expertise to detect suicidal tendencies and with the control necessary to care for the person's well-being fails to take such steps. *(See, Huntley v State of New York,* 62 NY2d 134, 137 [1984] [plaintiff left hospital premises, unsupervised and jumped from the roof of a nearby parking garage; failure of hospital staff member to transmit information to staff psychiatrist who then allowed plaintiff to leave premises rendered hospital liable for negligence].) As the City correctly argues, the City had neither physical custody nor control over

decedent, "a competent adult, whom the Department only evaluated for fitness as an officer and never treated as a psychiatric patient."

■ The record before us contains not one scintilla of evidence either to indicate that decedent was suicidal or that the Department should somehow have anticipated that he was. We are unpersuaded that Knour's parenthetical note of *possible* suicidal ideation, 18 months prior to the act itself, should have sufficiently alerted the Department that decedent would try to take his life; this is bolstered by the fact that both decedent and plaintiff flatly denied that he was suicidal. There was never any other reference to suicide, throughout all of the counselling, by either of the Cygans. Further, even *plaintiff's* expert declined to testify that decedent exhibited suicidal tendencies.

■ We also find it of moment that plaintiff's expert witness stated that the suicide sounded like an impulsive act. Simply taking the minimal amount of time necessary to load the shell into his gun does not detract from the apparent impulsive character of his suicide since the opportunity to kill himself was never absent. This is supported by the fact that there were always guns and other weapons in the Cygan abode throughout the time that his guns were removed. (Sloan, Rivera, Reay, Ferris, and Kellerman, *Firearms Regulations and Rates of Suicide,* 322 [No. 6] New Eng J Med 369, 371 ["We found a strong positive association * * * between the rates of handgun ownership and the rates of suicide by firearms"].) In any event, we agree with the City that, as a matter of law, it cannot be stated that he would not have found another way to kill himself. *(See, Kinch v Adams,* 46 AD2d 467, 469 [3d Dept 1975], *affd* 38 NY2d 792 [1975].)

■ Concerning plaintiff's implied allegations that the Department put a gun into the hands of a "periodically alcoholic police officer" we are similarly unpersuaded. While Cygan indulged, sometimes to excess, he successfully completed an alcohol education program, and he was never disciplined for alcohol use. That the Department did not deem him to be an alcoholic was bolstered by decedent's and plaintiff's reports of moderate or no drinking, thus negating plaintiff's contention. *(Cf., McCrink v City of New York,* 296 NY 99 [1947].)* In *McCrink* the Court of Appeals ruled that the City could be held liable where an intoxicated off-duty officer with a substantial history of drunkenness, vicious propensities and re-

peated disciplinary problems related to drinking shot a civilian. This court does not mean to make light of the two incidents in which decedent drank beer on the job, and we acknowledge the sad fact that alcoholism has been associated with a higher risk of suicide. *(Firearms Regulations and Rates of Suicide, op. cit.,* at 372.)* However, drinking one beer at lunchtime six years prior to the events in question and drinking two beers on the January night his wife demanded a divorce cannot be deemed to suggest that decedent was an alcoholic. *(See, Milker v City of New York,* 45 AD2d 1021, 1022 [2d Dept 1974], *affd* 36 NY2d 973 [1975].)* As to the latter episode, plaintiff's behavior when he was brought home, in a state of distress, by his colleagues, appears to explain, if not excuse, his conduct.

Finally, we decline to adopt plaintiff's argument that the policy of restoring or retiring officers within one year of being placed on restrictive duty, thus complying with the Mayoral directive, served to decedent's detriment. The thorough case history amply demonstrates that there was no reason for the Department to have reasonably anticipated that decedent was unfit to carry a gun or that he would injure himself or anyone else. *(Cf., Bonsignore v City of New York, supra,* 683 F2d, at 638.)* In *Bonsignore,* the motion court found, after a jury verdict was returned in plaintiff's favor, that "Bonsignore exhibited many of the characteristics that were supposed to flag disturbed officers so that they could receive psychological help" *(supra,* 521 F Supp, at 398). This is in sharp contrast to the case at bar, where decedent *voluntarily* sought help, cooperated and participated fully and was on restricted duty for a number of months after the first of several determinations that he was fit to be restored to full duties with guns. *(Compare, Bonsignore v City of New York,* 521 F Supp 394, *supra* [where officer placed on 13-year limited duty was never investigated]; *see generally, Purdy v Public Adm'r of County of Westchester,* 72 NY2d 1, 6, 9 [1988].)*

Accordingly, the judgment of the Supreme Court, New York County (Martin Evans, J.), rendered April 6, 1989, which, following a jury verdict finding decedent one-third liable and defendant City of New York two-thirds liable for decedent's suicide, awarded plaintiff, decedent's wife, damages of $1.3 million plus interest and costs, should be unanimously reversed, on the law, defendant's motion for an order pursuant to CPLR 4404 (a) setting aside the verdict granted and the complaint dismissed, without costs. The clerk is directed to

enter judgment in favor of defendant-appellant dismissing the complaint.

KUPFERMAN, J. P., SULLIVAN and MILONAS, JJ., concur.

Judgment, Supreme Court, New York County, entered on April 6, 1989, unanimously reversed, on the law, defendant's motion for an order pursuant to CPLR 4404 (a) setting aside the verdict granted and the complaint dismissed, without costs.