Benitez v City of New York (2021 NY Slip Op 00617)





Benitez v City of New York


2021 NY Slip Op 00617


Decided on February 04, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 04, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta
Troy K. Webber, Lizbeth González, Saliann Scarpulla


Index No. 152323 Appeal No. 12850 Case No. 2020-02504 

[*1]The Estate of Jose E. Benitez, Plaintiff-Appellant,
v
The City of New York, et al., Defendants-Respondents.



Plaintiff appeals from the order of the Supreme Court, New York County (Lyle E. Frank, J.), entered November 18, 2019, which granted defendants' motion for summary judgment dismissing the complaint.




Law Offices of Iannuzzi & Iannuzzi, New York (Nicholas P. Iannuzzi of counsel), for appellant.
James E. Johnson, Corporation Counsel, New York (Lorenzo Di Silvio and Eric Lee of counsel), for respondents.



ACOSTA, P.J. 


This wrongful death action arises out of the tragic suicide of NYPD Sergeant Jose Benitez in 2015. Although plead as a negligence action, plaintiff asserted facts in its complaint alleging that the NYPD had knowledge of Benitez's mental condition and, instead of accommodating Benitez, assigned him to a position that would precipitate his death. However, plaintiff did not allege either a State or City Human Rights Law violation for the NYPD's failure to accommodate Benitez. We are, therefore, constrained to affirm the dismissal of the complaint. The NYPD knew of Benitez's disability, and yet it failed to engage Benitez in an interactive discussion to ascertain appropriate accommodations (see Administrative Code of City of NY § 8-107[15][a]).[FN1] More troublingly, the NYPD has not even acknowledged that it has an affirmative obligation to engage a disabled officer in an interactive dialogue to determine the extent to which the officer needs accommodation.
Benitez was an eight-year veteran of the force who graduated second in his class from the Police Academy. He served with distinction, and was promoted to the rank of sergeant six years after joining the force. Two years later, in September 2014, Benitez was promoted to supervisor of a newly formed surveillance unit operating under the NYPD's Grand Larceny Division in the Bronx. That month, he posted a video on Facebook concerning recent events in his personal life. Benitez's brother, Valentin, described the video as "dramatic . . . with sad music in the background." Valentin found it unusual that Benitez posted the video, noting that Benitez generally did not "post [] things online."
Members of Benitez's NYPD unit also saw the Facebook video, became concerned for his well-being, and informed his commanding officer, Lieutenant Michael Deckert, of their concerns. After viewing the video, Deckert and two officers visited Benitez at home for a wellness check. They found him "extremely despondent," sitting in a sparsely furnished room. Benitez hugged Deckert and "started crying." He was "not very responsive to questions," and seemed "zoned out." Deckert secured Benitez's firearm and took him to see the precinct's duty captain, who referred Benitez to the NYPD's psychological unit for a fit-for-duty evaluation.
Dr. Catherine Lamstein-Reiss, a psychologist in that unit, evaluated Benitez. The purpose of her evaluation was limited to determining whether Benitez could continue working full capacity as a police officer, work in a restricted capacity, without a firearm and assigned to non[*2]-patrol duties, or not perform the duties of a police officer in any capacity. Lamstein-Reiss explained, "Restricted [duty] is when someone is medically or psychologically not able to do their full duties." Once an individual is placed on restricted duty, they are reassigned to an appropriate post based on the NYPD's needs.
During her evaluation, Lamstein-Reiss noted that Benitez "seemed depressed [and] emotional but reported doing much better than he had six months earlier." She concluded that Benitez could work on restricted duty and that his shield and service weapon should be removed. She completed a "Removal of Firearms" form and a "Restricted Duty" form, but left the "Recommended Restrictions" section of the latter form blank.
Lamstein-Reiss testified that neither she nor anyone at the NYPD treated Benitez for his condition. Lamstein-Reiss was a psychologist, not a psychiatrist with a medical degree that qualified her to prescribe medication for Benitez's mental health, although the NYPD did refer Benitez to a hospital for treatment two days after Lamstein-Reiss's initial evaluation.
Shortly thereafter, Benitez's private treating physicians diagnosed him with bipolar I disorder, which, according to Lamstein-Reiss, is "a condition where someone has both manic episodes and depressive episodes." Between September and December 2014, multiple physicians at several private facilities treated his condition, and Benitez was hospitalized on three separate occasions for a total of about eight weeks. While hospitalized, Benitez took sick leave. When he returned to work, Lamstein-Reiss was scheduled to do a regular evaluation of his fitness for duty. She was provided with his hospital records, and was aware of his diagnosed condition.
Between and after his hospitalizations, Benitez was in outpatient treatment and therapy. His doctors prescribed medication for his condition and recommended that he get enough sleep. However, they did not say that it was necessary for him to sleep at night or keep a traditional day-work schedule. Upon returning to work, Benitez was assigned to an overnight unit, responsible for monitoring video cameras in housing complexes across the City and does not entail patrol or enforcement duties.
Valentin testified that, at the time of his death, Benitez was on medication that had been prescribed to help him sleep. Although Valentin believed that Benitez was taking his medication, Lamstein-Reiss recalled Benitez "not wanting to take the medication for [his bipolar disorder], thinking that he could treat it with exercise and nutrition and things like that, hoping that he didn't need medication . . . he recurrently stopped [taking] the medication." She last saw him in December 2014, at which time Benitez's doctors had prescribed Abilify and Zyprexa, "medication[s] that work[] in the brain to treat schizophrenia . . . [and] rebalance[] dopamine and serotonin to improve thinking, mood, and behavior" ("Aripiprazole (Abilify)," National [*3]Alliance on Mental Illness [Feb. 2020], available at https://perma.cc/7E2W-8UU6 [cached Nov. 28, 2020]; "Olanzapine (Zyprexa)," National Alliance on Mental Illness [Feb. 2020], available at https://perma.cc/5S88-J9PE [cached Nov. 28, 2020]).
Benitez told Valentin that he did not like working nights and "that it kind of messed up his schedule," but Valentin did not know whether Benitez shared his concern with anyone else. Nor did he think that Benitez ever formally requested an accommodation for a disability. Valentin said that Benitez "never put in for a transfer of hours or anything like that[,] . . . he didn't want to step on anyone's toes . . . [or] ruffle any feathers."
Starting at 11 p.m. on March 8, 2015, Benitez worked an overnight shift that lasted until 7 a.m. on March 9, 2015, and then attended a training session that lasted until 3 p.m. He was not scheduled to return to work until 11 p.m. on March 10, 2015. At around 5 a.m. on March 10, Benitez called Valentin while Valentin was on his way to work. Although Benitez sounded tired, Valentin did not notice any "red flags" during their conversation. Within a few hours of that conversation, Benitez's mother discovered that Benitez had committed suicide by hanging.
In 2017, plaintiff — Benitez's estate — served a notice of claim on defendants, asserting a claim for "[w]rongful death caused by the blatant negligence and failure to properly assess, attend, treat, and provide care for [Benitez]'s mental state and condition, which blatant failure and neglect exacerbated [Benitez]'s deteriorating mental condition and directly precipitated his death."
In its complaint, plaintiff alleged, among other things, that Benitez's assignment to the overnight unit not only led him to be sleep-deprived, but also prevented him from "get[ting] onto any regular and/or healthy schedule for an individual with" bipolar disorder. "The NYPD had knowledge of [Benitez]'s condition, and instead of taking said condition into account, they negligently assigned him to a position that would precipitate [his] untimely death." Thus, the complaint asserted that the action was "based on the [d]efendants' negligent treatment and/or lack of acknowledgement of [Benitez]'s mental state, which . . . caused [his] death."
Defendants moved for summary judgment dismissing the complaint. They argued that the NYPD did not have a duty to prevent Benitez from committing suicide and that it would be speculative to conclude that his work schedule proximately caused his suicide.
In opposition, plaintiff argued for the first time that Labor Law §§ 200 and 27-a and General Municipal Law § 205-e required that defendants provide Benitez with a safe work environment, asserting that a person with bipolar disorder required good sleep hygiene and that defendants failed to accommodate Benitez's need for sufficient sleep by assigning him to work nights. Plaintiff also argued that defendants failed to accommodate Benitez as required under [*4]both the New York City and New York State Human Rights Laws. However, plaintiff conceded that this case "ha[d] been primarily brought on a claim of negligence," that it had not interposed separate statutory causes of action, and that "this [wa]s a negligence c[ase], not a c[ase] based on discriminatory practices." Supreme Court granted defendants' motion.
Inasmuch as plaintiff did not raise any Human Rights Law violations for failure to accommodate, we are constrained to affirm (see Rollings v New York City Bd. of Educ., 68 AD3d 540 [1st Dept 2009]). Supreme Court correctly concluded that defendants did not owe Benitez a duty to prevent him from committing suicide. A defendant owes such a duty where it is either "a facility such as a hospital or jail which is in actual physical custody of an individual" or "an institution or mental health professional with sufficient expertise to detect suicidal tendencies and with the control necessary to care for the person's well-being" (Cygan v City of New York, 165 AD2d 58, 67 [1st Dept 1991], lv denied 78 NY2d 855 [1991]). Here, defendants had neither "actual physical custody" of the decedent nor "the control necessary to care for [his] well-being" before his suicide (id.). Furthermore, a defendant only breaches its duty to prevent a decedent's suicide when it "fails to take reasonable steps to prevent a reasonably foreseeable suicide (id.)," and there is no evidence in this case that the decedent's suicide was "reasonably foreseeable" (id.).
On appeal, plaintiff argues that the NYPD failed to accommodate Benitez under, among other statutes, the City Human Rights Law (City HRL). However, plaintiff improperly raises elements of disability discrimination in the context of a wrongful death action. Plaintiff alleged that the NYPD had knowledge of Benitez's disability and utterly failed to accommodate his condition. In response, the NYPD ignored its obligation under clear statutory law, City anti-discrimination policy and the case law of this Department and the Court of Appeals, which hold that the NYPD was affirmatively obligated to accommodate Benitez (see Phillips v City of New York, 66 AD3d 170, 180 [1st Dept 2009]). Indeed, the NYPD explicitly states that it has no affirmative obligations to accommodate police officers that, pursuant to its own medical evaluation, have been found to be disabled. The NYPD is incorrect in terms of its obligation to accommodate an officer's needs when it is aware of the officer's disability.
The City HRL defines disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment" (Administrative Code § 8-102). Pursuant to Administrative Code § 8-107(15)(a), an employer has an affirmative obligation to make "a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the [employer]" (emphasis added) (see [*5]Romanello v Intesa Sanpaolo, S.p.A, 22 NY3d 881, 885 [2013]; Hosking v Memorial Sloan-Kettering Cancer Ctr., 186 AD3d 58, 62 [1st Dept 2020]; Phillips, 66 AD3d at 180; Matter of Rodriguez v NYC Hous. Auth., 2018 NY Slip Op 32270[U], *7 [Sup Ct, NY County 2018] ["The (City) HRL further affirmatively requires that, even in the absence of a specific request, an employer 'shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job. . . provided that the disability is known or should have been known to the [employer]'").
The NYPD knew of Benitez's disability. Between September and December 2014, Benitez was hospitalized on three separate occasions, when he was diagnosed with bipolar I disorder. Bipolar sufferers, when in a triggered state, are often vulnerable to suicide. While this disorder is treatable with medication, studies show that "all of the psychotherapies supported to date for bipolar disorder put some emphasis on sleep hygiene or sleep—wake regulation" (Ellen Frank, Interpersonal and Social Rhythm Therapy: A Means of Improving Depression and Preventing Relapse in Bipolar Disorder, Journal of Clinical Psychology: In Session, May 2007, vol. 63[5], 463-473, 473; see also Dr. Susan Mallkoff-Schwartz, et al., Stressful Life Events and Social Rhythm Disruption in the Onset of Manic and Depressive Bipolar Episodes, A Preliminary Investigation, Arch Gen Psychiatry, 1998, vol. 55(8), 702-707).
After each hospital stay, Benitez was assessed by the NYPD's own Lamstein-Reiss, who was in possession of Benitez's hospital records. Significantly, when Benitez was discharged from Columbia Presbyterian Hospital on or about October 3, 2014, he was instructed, "Sleep enough. Get to sleep and wake up at about the same time every day, eat a healthy diet, exercise regularly." Upon learning of Benitez's disability, the NYPD should have engaged him in a good-faith interactive process to assess his needs. "The interactive process continues until, if possible, an accommodation reasonable to the employee and employer is reached" (Phillips, 66 AD3d at 176; see also Hosking, 186 AD3d at 62-65).
Such accommodations should include, but are not limited t0, job
restructuring and modified work schedules. Thus, "there are no accommodations that may be 'unreasonable' if they do not cause undue hardship" (Phillips, 66 AD3d at 182), and "there is no accommodation (whether it be indefinite leave time or any other need created by a disability) that is categorically excluded from the universe of reasonable accommodation" (id.; see Forgione v City of New York, 2012 WL 4049832, *9, 2012 US Dist LEXIS 130960, *26-27 [ED NY 2012]).
However, rather than taking his mental disorder and sleep hygiene into consideration, the NYPD made no accommodations for Benitez's mental disability. Nor do they make such accommodations for other officers who have such disabilities. Instead, they simply assess and assign on an as-needed basis[*6], treating the disabled individual like every other officer placed on restricted duty. Assignments are made only with consideration to the NYPD's needs. Significantly, Lamstein-Reiss's input was not used to determine an appropriate placement or any accommodations that should have been implemented.
This approach is not taken by the NYPD with officers on restricted duty for medical — as opposed to psychological — reasons. According to Lamstein-Reiss, if an officer is put on restricted duty for medical reasons, that officer can be listed with "limited capacity." An officer who can otherwise perform his duties, but because of a medical condition is not capable of performing the full job requirements, is listed as limited, and his assignment is curtailed accordingly.
In short, the NYPD's "failure to reasonably accommodate [Benitez's] disability as soon as [it knew] of that condition is the very societal ill which the relevant anti-discrimination statutes were designed to combat" (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 843 [2014]). "The statutes recognize the employer's failure in that regard to be particularly invidious because it forces the worker either to quit his or her job in order to preserve the worker's health or else to continue working without adequate protective measures and then succumb to a debilitating impairment" (id. at 843-844). Sadly, here, Benitez succumbed to a debilitating impairment before he was properly accommodated. Unfortunately, this Court is unable to grant Benitez any relief because its estate failed to invoke the very statute that was enacted to protect him.
Accordingly, the order of the Supreme Court, New York County (Lyle E. Frank, J.), entered November 18, 2019, which granted defendants' motion for summary judgment dismissing the complaint, should be affirmed, without costs. On the Court's own motion, the Clerk is directed to substitute "Valentin Benitez, as Administrator of the Estate of Jose L. Benitez" in place and stead of plaintiff herein, and to amend the caption accordingly.[FN2]
Order, Supreme Court, New York County (Lyle E. Frank, J.), entered November 18, 2019, affirmed, without costs. On the Court's own motion, the Clerk is directed to substitute "Valentin Benitez, as Administrator of the Estate of Jose L. Benitez" in place and stead of plaintiff herein, and to amend the caption accordingly.
Opinion by Acosta, P.J. All concur.
Acosta, P.J., Webber, González, Scarpulla, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 4, 2021



Footnotes

Footnote 1: See e.g. Jena Hilliard, New Study Shows Police at Highest Risk for Suicide of any Profession, Addiction Center, Sept. 14, 2019, https://www.addictioncenter.com/news/2019/09/police-at-highest-risk-for-suicide-than-any-profession/ accessed on Jan. 16, 2021.

Footnote 2: Although only the personal representative of a decedent may maintain an action for wrongful death (EPTL 5-4.1[1][1], the complaint alleges that the decedent's brother was duly appointed the administrator of the decedent's estate by order of the Surrogate's Court, Queens County, and defendants "waived, as a matter of law, any objection to the plaintiff's alleged lack of capacity to sue . . . by failing to raise any objection to plaintiff's capacity . . . in either a pre-answer motion[] [or] the answer itself" (Spatz v Bajramoski, 214 AD2d 436, 437 [1st Dept 1995]). An action instituted in the name of the estate, and not its personal representative, is subject to correction by amendment (CPLR 2001; see Rosenberg v Caban, 16 NY2d 905 [1965]). Accordingly, in lieu of dismissing the action nostra sponte for lack of capacity, and in the interest of justice, we direct the Clerk to make the appropriate substitution for plaintiff in this matter and to amend the caption accordingly.